

# In the Missouri Court of Appeals
## Eastern District

### DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | ED100110 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of Lincoln County |
| v. | ) | 12L6-CR00003-01 |
| | ) | |
| NICHOLAS A. EVANS, | ) | Honorable Chris K. Mennemeyer |
| | ) | |
| Appellant. | ) | Filed: September 30, 2014 |

## Introduction

Nicholas Evans (Defendant) appeals the judgment entered upon his conviction after a jury found him guilty of assault in the first degree and armed criminal action. This case, along with another case handed down today, State v. Murphy, ED99942, present the question of whether a hand or a fist can qualify as a "dangerous instrument" in support of a conviction for the unclassified felony of armed criminal action. We conclude that the plain language of the statutory definition does not contemplate a hand or fist as a "dangerous instrument." Defendant also argues that the trial court abused its discretion in allowing the State to present a prejudicial photograph to the jury, which had an outcome-determinative effect on his trial. We reverse in part and affirm in part.

Background

Viewed in the light most favorable to the verdict, the evidence at trial was the following. During the early morning hours of December 31, 2012, Megan Crawford (Crawford) rode with her cousin, Emily Martin (Martin), to Georgee's Bar to pick up Martin's boyfriend, LJ. Martin drove her compact car, and Crawford rode in the passenger seat. Crawford's boyfriend went with them as well and rode in the backseat. When they arrived at Georgee's, Crawford saw her friend James Zemek (Victim) outside, and she got out of the car to go talk to him. After a brief conversation, Crawford returned to the car to wait for LJ. Crawford believed Victim was intoxicated.

Eventually, LJ came out of the bar with Defendant and two other men. LJ, Defendant, and one other man attempted to get in the backseat of Martin's car, where Crawford's boyfriend was seated. Crawford told them there was not enough space for everyone to fit, and she believed they were there to pick up LJ only.

Victim approached the car and asked Crawford if she was okay. Defendant asked Victim why he was getting involved because it was not any of Victim's business, which caused Defendant and Victim to argue. Two other men, one of whom was Crawford's uncle, Zack Richter (Richter), came over to the car and asked if everyone was all right. Crawford told them everything was fine. After that, Victim walked away with Richter and the other man. As Victim walked away, Defendant's friends were physically restraining Defendant.

Defendant broke away from his friends and ran over to Victim. Defendant punched Victim on the side of Victim's face, and Victim appeared to become unconscious after the first punch. Defendant continued to punch Victim. Richter

2

unsuccessfully attempted to pull Defendant away from Victim. Another man, Anthony Winebarger (Winebarger) did pull Defendant away briefly, but Defendant broke free and said, "I'm going to get you, white boy. It's on now." Defendant ran back to Victim and punched him again. After this, LJ and another man ran over to Victim, and one of them kicked Victim in his upper torso area. Defendant had punched Victim four to five times in total, but Victim never moved after the first punch.

After the attack was over, Defendant and the men with him ran away. When Crawford and her friends saw that Victim was still not waking up and was bleeding profusely from his face, they put him in the back of a car and took him to the hospital. He regained consciousness at the hospital, but he had to be flown by helicopter to a hospital in St. Charles.

Victim sustained severe brain trauma, swelling, and bleeding, as well as a skull fracture. These injuries created a life-threatening situation, and Victim would likely have died without treatment. Victim spent two weeks in the hospital, and he underwent surgery after that to repair his skull. Since this incident, Victim has been more confused and forgetful, and he struggles with speech. He experiences dizziness regularly and has to lay down and rest during the day. He is not able to play with his kids in the same way he did before. He has migraine headaches, and his vision is also impaired since this incident. He does not remember the incident at all.

Defendant was charged with assault in the first degree and armed criminal action. The State argued that the jury could find Defendant guilty of armed criminal action, because he committed the assault through use of a "dangerous instrument," in this case, his fists. The jury found Defendant guilty of both counts, and the trial court sentenced

3

Defendant to concurrent terms of ten years in prison for first-degree assault and three years for armed criminal action. This appeal follows.

## Discussion

Defendant raises two points on appeal. In Point I, he argues that the trial court abused its discretion in admitting Exhibit 19, a photograph that a witness had used to identify Defendant, because the photograph was more prejudicial than probative. In Point II, Defendant argues that the evidence was insufficient for the jury to find him guilty of armed criminal action because a fist cannot qualify as a "dangerous instrument."

## Standard of Review

Regarding Point I, a trial court has broad discretion in the admission of evidence, and we will reverse a conviction based on an evidentiary error "only if the error was so prejudicial that it deprived the defendant of a fair trial." State v. Tokar, 918 S.W.2d 753, 761 (Mo. banc 1996). Such prejudice occurs when "the errors are more likely than not to have affected the outcome." State v. Patton, 419 S.W.3d 125, 133 (Mo. App. E.D. 2013).

In Point II, Defendant challenges the sufficiency of the evidence to support his conviction for armed criminal action by raising the question of whether a fist can qualify as a "dangerous instrument" under the statutory definition. Statutory interpretation is a legal question that we review *de novo*. S. Metro. Fire Protection Dist. v. City of Lee's Summit, 278 S.W.3d 659, 666 (Mo. banc 2009). Thereafter, we examine the whole record in light of our interpretation, to determine "whether the State has introduced sufficient evidence for any reasonable juror to have been convinced of the defendant's guilt beyond a reasonable doubt." State v. Nash, 339 S.W.3d 500, 509 (Mo. banc 2011).

4

Point I

Defendant argues that the trial court abused its discretion in admitting Exhibit 19 into evidence because it was irrelevant and more prejudicial than probative. We agree. However, in light of the other evidence of Defendant's guilt, we conclude that the error was not outcome-determinative.

Exhibit 19 came into evidence during the State's examination of Winebarger, when the State recalled him after his initial testimony. Prior to that during Defendant's cross-examination of Winebarger, defense counsel asked Winebarger if he knew LJ, and Winebarger replied that he did not. Winebarger added that he had learned the names of LJ and Defendant when he saw their pictures on Facebook, which someone had accessed from a cell phone at the hospital.

The State recalled Winebarger to ask about a specific Facebook photograph of Defendant, Exhibit 19. The following colloquy occurred:

> [STATE:] [W]as this the photograph that you looked at when you were determining whether or not that was the same Nick Evans that you saw at Georgee's bar the evening in question?
>
> [WINEBARGER:] Yes. This was one of them. This one here is not as good as the other ones. The other ones, we were able to identify him better.
>
> . . .
>
> [STATE:] [W]ere you able to determine, based on that tag on that individual in the picture, that it was the same individual that you saw at Georgee's bar?
>
> [WINEBARGER:] Not so much with this picture, but there was obviously other pictures that clearly were[,] . . . other pictures where he had a more normal appearance . . . .

5

The State moved for admission of Exhibit 19, and defense counsel argued that it was prejudicial because it pictured a group of people, including Defendant, who were making some kind of finger signs. Defense counsel argued the jury could draw an adverse inference about the signs, possibly that they were gang signs. The trial court decided that based on the fact that the Facebook photographs were first mentioned during cross-examination, the court would allow Exhibit 19 into evidence.

Evidence must be relevant to be admissible. State v. Anderson, 76 S.W.3d 275, 276 (Mo. banc 2002). Logically relevant evidence goes to the question of whether a material fact is true. Id. However, even logically relevant evidence is admissible only if it is legally relevant. Id. "Legal relevance weighs the probative value of the evidence against its costs—unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." Id. Though a trial court has broad discretion in admitting photographs, there are limitations on this discretion. State v. Floyd, 360 S.W.2d 630, 633 (Mo. 1962). "[P]hotographs should not be admitted where their sole purpose is to arouse the emotions of the jury and to prejudice the defendant." Id. (citation omitted).

Here, Exhibit 19 was one of many photographs that witnesses used to identify Defendant as the man who punched Victim. Thus, it was logically relevant. However, the legal relevance here is lacking. Defendant's identity was not contested. Defendant conceded he was there but gave a different version of events, arguing essentially self-defense and possible additional unintentional contact.[1] Moreover, Winebarger stated that

---

[1] Specifically, Defendant's counsel stated in his opening statement that he expected the evidence to show that Defendant "sw[u]ng because [he was] trying to defend [him]self." Defendant later testified that Victim swung at him twice, and then someone stepped in between Victim and Defendant. Shortly after that, Victim came toward Defendant again, and Defendant "swung out and [] barely tapped his chin," which

6

though he viewed Exhibit 19, it was not the most helpful in identifying Defendant. Thus, the probative value of this evidence was minimal. The photograph was prejudicial in that the jury saw a group of men, including Defendant, making faces and displaying hand signs. Defendant was sticking out his tongue. The jury could have drawn an adverse inference from this image of Defendant, and Winebarger testified there were several other Facebook photographs available that he viewed and pictured Defendant with "a more normal appearance." We are strained to find a reason for the State's choice of this picture that does not include its prejudicial effect. Given the potential for prejudice, in light of the very minimal probative value, we find that the trial court abused its discretion in admitting Exhibit 19.[2] See id.

Finding error, we now must consider whether that error was outcome-determinative. See Anderson, 76 S.W.3d at 277. Defendant argues that because the jury had to discern which of the two versions of events to believe, Exhibit 19 led the jury to believe Defendant a bad person, and the conviction was based on this belief. Defendant points out that the jury deliberated for four hours, showing they were conflicted, and Defendant argues this shows Exhibit 19 did affect their verdict. We disagree.

The evidence that Defendant punched Victim repeatedly while Victim was unconscious was corroborated by three eyewitnesses, and the doctors who treated Victim

made Defendant fall to the ground. Defendant testified that while on the ground, he "received numerous blows to the back, to [his] head." As Defendant tried to get up, he "was swinging wildly with [his] right arm trying to get [him]self free to get up off the ground." Defendant was not sure what he hit when he was swinging and trying to stand up.

[2] The State argues such a conclusion is mistaken because the evidentiary rule prohibiting evidence of other crimes or misconduct would only be violated if the evidence showed that the Defendant was in a gang. See State v. Davidson, 242 S.W.3d 409, 415 (Mo. App. E.D. 2007). While evidence may not violate an exclusionary rule and be logically relevant, it can still be error to admit such evidence where the prejudicial effect of such evidence outweighs any probative value. In Davidson, the court found letters defendant wrote "highly probative" and no prejudice from the vague statement in a letter that defendant was "a G," implying gang membership. Id. While we reach a different conclusion as to legal relevance under the facts here, ultimately the Davidson court found, as we do, that the vague reference to gang membership did not "support a claim of reversible error." Id.

7

detailed the extent of Victim's injuries to the jury. All of this evidence refuted Defendant's testimony that he merely "tapped" Victim and may have accidently hit Victim additional times when his arms were "swinging wildly" as he tried to stand up. The fact that the jury deliberated for four hours does not establish prejudice here. They could have been debating any number of issues raised by the law and the evidence, including the elements of armed criminal action, which we will discuss in Point II. Thus, Defendant has not shown that Exhibit 19 had an outcome-determinative effect on his trial. See Anderson, 76 S.W.3d at 276. Point denied.

## Point II

Defendant argues that his conviction for armed criminal action, based on the jury finding that he committed first-degree assault with a dangerous instrument, must be reversed because the only evidence was that he hit Victim with his fists, and a fist cannot qualify as a "dangerous instrument" under the statutory definition. We agree.

Section 571.015.1[3] provides that a person is guilty of the felony of armed criminal action when that person commits another felony "by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon." A deadly weapon is something that is inherently dangerous, such as a firearm; whereas a dangerous instrument can be an ordinary or "seemingly innocuous item" that becomes dangerous under the circumstances in which it is used. State v. Williams, 126 S.W.3d 377, 384 (Mo. banc 2004). Because Defendant did not use a weapon here, the relevant inquiry is whether he utilized a "dangerous instrument" when he punched Victim with his fists.

"Dangerous instrument" is defined in Section 556.061(9):

---

[3] All statutory references are to RSMo. (Supp. 2013) unless otherwise indicated.

8

> [A]ny instrument, article or substance, which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury[.]

Few courts in Missouri have addressed the issue of whether a body part can fall under this definition, and none have considered the threshold determination required by the statute: whether, in light of the plain language of the definition, a hand, fist, or other body part is an "instrument, article or substance," and therefore capable of becoming a "dangerous instrument" as a matter of law. This is the question presented here.

"The primary rule of statutory interpretation is to effectuate legislative intent through reference to the plain and ordinary meaning of the statutory language." State v. Graham, 204 S.W.3d 655, 656 (Mo. banc 2006). Rather than hyper-technical, statutory construction should be reasonable and logical, and should determine whether the language would be clear to persons of ordinary intelligence. In re Boland, 155 S.W.3d 65, 67 (Mo. banc 2005); State v. Graham, 149 S.W.3d 465, 467 (Mo. App. E.D. 2004).

We conclude that a reasoned and common-sense reading of the terms "instrument, article or substance" from the definition of "dangerous instrument" indicate an external object or item, rather than a part of a person's body. The most relevant dictionary definition of "instrument" is "a tool or implement, esp. one for delicate or scientific work."[4] THE OXFORD COLLEGE DICTIONARY 701 (2d ed. 2007); see also Gash v. Lafayette County, 245 S.W.3d 229, 232 (Mo. banc 2008) (in absence of statutory definition, courts derive plain and ordinary meaning from dictionary definition). In ordinary language, hands, feet, or other body parts are not commonly referred to as

---

[4] Less relevant here, but no more persuasive in convincing us that body parts are included, are the definitions of "article" and "substance." "Article" is defined in relevant part as "a particular item or object, typically one of a specified type"; and "substance" as "a particular kind of matter with uniform properties[;] an intoxicating, stimulating, or narcotic chemical or drug, esp. an illegal one." THE OXFORD COLLEGE DICTIONARY 67, 1369 (2d ed. 2007).

9

instruments, or even as articles or substances. Thus, a plain and ordinary reading of the terms instrument, article, and substance do not indicate a body part.

Moreover, such a conclusion is consistent with the armed criminal action statute's context and prior case law. While the current armed criminal action statute has been in effect since 1979, prior versions of the statute contemplated additional punishment for felonies committed only through the use of weapons. See Section 559.225.1, RSMo. (Supp. 1976) (same language as current version save omission of "instrument," thus proscribing only use of "dangerous or deadly weapon"). Before 1976, the statute existed not as a separate felony offense, but simply as a means of enhancing the sentence of a person committing a felony, when that felony was committed using a deadly weapon. Section 4821 (RSMo. 1939) ("If any person shall be convicted of committing a felony, or attempting to commit a felony, while armed with a pistol or any deadly weapon[,] the punishment elsewhere prescribed for said offense . . . shall be increased . . . by imprisonment . . . for two years"). The legislature's intent was to impose an additional punishment to those who commit felonies "in virtue of [their] having been committed through the use of a dangerous or deadly weapon." Sours v. State, 603 S.W.2d 592, 599 (Mo. banc 1980); see also State v. Kane, 629 S.W.2d 372, 374 (Mo. banc 1982) (reciting prior versions of armed criminal action statute[5]).

Thus, the current version, allowing conviction for armed criminal action when a felony is committed through the use of a "dangerous instrument," in addition to a deadly

---

[5] However, we note that in Kane, the court quotes the 1976 version from Section 559.225, RSMo. (Supp. 1976), punishing the use of a "dangerous or deadly weapon" in committing a felony, and the court notes that it is "now [Section] 571.015, RSMo 1978." 629 S.W.2d at 375. This appears to be an oversight, because actually when enacted in 1977 (effective in 1979), Section 571.015 differed from the prior version in that the legislature inserted the word "instrument," resulting in the phrase "through the use, assistance, or aid of a dangerous *instrument* or deadly weapon" (emphasis added), the same version of the statute that is currently in place. Compare Section 559.225.1, RSMo. (Supp. 1976) with Section 571.015.1, RSMo. (Supp. 1977) (current as of RSMo. (Supp. 2013)).

10

weapon, was an expansion by the legislature to include other types of items that can be used to cause the same degree of harm that weapons do. This seems to be an acknowledgement by the legislature that such items were being used as weapons, and that defendants were being convicted under the statute for committing felonies with items that were not technically weapons. Cf. State v. Davis, 611 S.W.2d 384, 386-87 (Mo. App. S.D. 1981) (noting under previous statute, items such as leather-sole shoes, rocks, hoe handle, and champagne bottle had been declared dangerous weapons).

It also indicates the legislature's intent to impose greater punishment on those individuals who choose to use an item or weapon to commit a crime than those who do not. This is logical when considering that likely a majority of the time, the potential for greater harm is present when persons committing crimes hold sharp, heavy, or otherwise potentially harmful objects, than if they have only their own hands at their disposal.[6] The title of the armed criminal action statute itself suggests a person who is "armed" with something more than his or her own body. Thus, we believe interpreting "dangerous instrument" to include body parts would unduly expand the reach of the armed criminal action statute and result in a significant departure from the historical intent of this enhanced punishment.[7]

---

[6] While of course there may be exceptions to this, it is reasonable to infer that the legislature sought to increase punishment for the general circumstance in which someone uses an item to inflict a greater degree of harm on a victim than he or she would have been able to without the item.

[7] Moreover, separate from the armed criminal action statute, the term "dangerous instrument" is incorporated into other criminal statutes as well. Examining those in context also confirms that the legislature did not intend for a "dangerous instrument" to include a body part. For example, Section 565.073(1) defines the crime of domestic assault in the second degree. That section states, in relevant part, that the crime occurs when a person "[a]ttempts to cause or knowingly causes physical injury . . . by any means, including but not limited to, by use of a deadly weapon or dangerous instrument, or by *choking or strangulation*." Section 565.073(1) (emphasis added). The definition of "dangerous instrument" from Section 556.061(9) applies in this section as well. Thus, if we interpreted "dangerous instrument" to include hands, that would render the words "choking or strangulation" superfluous, and is an undesired result. See Graham, 149 S.W.3d at 467 (statutes should not be interpreted so as to render some phrases mere surplusage). This also illustrates that the legislature is capable of articulating and including additional

11

Turning to precedent, it is noteworthy at the outset that in the nearly 35 years since Section 571.015.1 (armed criminal action) became effective, no Missouri appellate decisions considering whether a particular item is a "dangerous instrument" as used in Section 571.015.1 concern a part of the defendant's body.[8] The cases that do consider whether a body part constitutes a "dangerous instrument" do so in the context of assault statutes, to which the same definition of "dangerous instrument" applies. These cases are almost all consistent with our conclusion.

In Seiter v. State, this Court considered whether there was a sufficient factual basis for the defendant's plea of guilty to first-degree assault. 719 S.W.2d 141 (Mo. App. E.D. 1986). Under the statute in effect at the time, first-degree assault could be elevated from a class B felony to a class A felony upon a showing that the assault was "committed by means of a deadly weapon or dangerous instrument."[9] Id. at 142. This Court found that though the elements of first-degree assault were present, the facts supporting the plea were that the defendant choked the victim with his hands, and thus no evidence of a "dangerous instrument" supported the elevation to a class A felony. Id. at 143-44. This Court specifically distinguished the elements of first-degree assault, requiring an attempt to kill or cause serious physical injury, from the element of "with a dangerous instrument" as follows: "Although it is true an assault with fists may be a force likely to

means of committing the crime if it intends for them to be included, and the legislature did not choose to do so in the armed criminal action statute. See State v. Bouser, 17 S.W.3d 130 (Mo. App. W.D. 1999) (noting maxim *expresio unius est exclusion alterius*; inclusion of one thing implies exclusion of others).

[8] Though there is no way of knowing how often the State charges a defendant with committing armed criminal action with a part of his or her body, if the State regularly charged armed criminal action based on commission of a felony with the defendant's fist, we would have seen several direct or post-conviction appeals regarding this issue, and we have not. It is more likely that the State never anticipated charging armed criminal action for the use of fists as the plain language of this statute for over 35 years has not encompassed body parts as dangerous instruments.

[9] The current version of the statute removes any reference to "dangerous instrument," and instead elevates the crime to a class A felony where "the actor inflicts serious physical injury on the victim." Section 565.050.2.

12

produce death or great bodily harm, . . . this is not the same as classifying hands as dangerous instruments or deadly weapons . . . ." Id. (citing State v. Gardiner, 522 S.W.2d 323, 324 (Mo. App. 1974) (finding element of "with intent to kill or do great bodily harm" was satisfied with evidence that defendant hit victim with fists, because "fists could be a force likely to produce death or great bodily harm")); see also State v. Wheadon, 779 S.W.2d 708, 710-11 (Mo. App. E.D. 1989) (noting while fists could be "force likely to produce death or great bodily harm," they have not been found to be "deadly weapons" or "dangerous instruments" under first-degree assault statute).

The distinction identified by the Seiter court is the key distinction here. While Defendant's conviction for first-degree assault can certainly be upheld with evidence that he attempted to cause serious physical injury with his fists, which injury he in fact caused here; that is not the same as saying his fists are "dangerous instruments" for purposes of a conviction for armed criminal action.

The State relies on the Western District's decision in State v. Burch, which appears to be the only Missouri case finding a body part constituted a dangerous instrument. 939 S.W.2d 525 (Mo. App. W.D. 1997). The court there considered whether the evidence was sufficient for a conviction of second-degree assault, an element of which was that the assault was committed "by means of a dangerous instrument." Id. at 530. The evidence in Burch showed the defendant had beaten the victim on the head and face with the defendant's elbow. Id. at 531. The court noted that "[f]ists can be a force likely to produce death or great bodily harm within the meaning of the statute defining assault in the first degree." Id. at 530 (citing Wheadon, 779 S.W.2d at 711). The court then concluded that an elbow could also be such a force, and under the circumstances, the

13

defendant's elbow did cause serious physical injury. Id. at 530. Thus, the court found that the elbow was a "dangerous instrument" used to commit assault in the second degree. Id. We believe the court in Burch overlooked the distinction between a body part's ability to inflict serious bodily harm and a body part's classification as an "instrument." Thus, we decline to follow Burch.

Here, Defendant used his fists to punch Victim several times in the face. There is no doubt his fists caused serious physical injury to Victim, and were thus capable of doing so. However, the armed criminal action statute requires use of a "dangerous instrument," which requires a threshold finding that Defendant used an "instrument, article or substance" to commit the assault. Though dangerous in this case, because fists do not constitute an instrument, article, or substance, Defendant cannot be found to have committed this brutal assault on Victim with a "dangerous instrument," given the statutory definition. Because there was no evidence Defendant used anything other than his fists to assault Victim, the evidence at trial was insufficient to support his conviction for armed criminal action. Point granted.

## Conclusion

While the court's admission of Exhibit 19 was error, we are not convinced that such error was reversible, in light of the overwhelming evidence of Defendant's guilt for the count of assault in the first degree. However, there was insufficient evidence to support Defendant's conviction for armed criminal action, in that there was no evidence he used a "dangerous instrument" as defined in Section 556.061(9). Accordingly, we vacate Defendant's conviction for armed criminal action and corresponding sentence. In

14

all other respects, the judgment entered by the trial court is affirmed.

Gary M. Gaertner, Jr., Judge

Kurt S. Odenwald, P. J., concurs.
Robert G. Dowd, Jr., J., concurs.