

# In the Missouri Court of Appeals
## Eastern District

### DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED100972 |
| | ) | |
| Respondent, | ) | |
| | ) | Appeal from the City of St. Louis |
| vs. | ) | Circuit Court |
| | ) | |
| IVAN DOMINGUEZ-RODRIGUEZ, | ) | Honorable Rex M. Burlison |
| | ) | |
| Appellant. | ) | Filed: May 19, 2015 |

### Introduction

Ivan Dominguez-Rodriguez (Defendant) appeals the judgment and sentence of the Circuit Court of the City of St. Louis entered after a jury convicted him of first-degree assault, armed criminal action, and first-degree burglary. In four points relied on, Defendant claims that the trial court (1) plainly erred in submitting Instruction No. 9 for armed criminal action; (2) clearly erred in overruling his *Batson*[1] objections to the prosecutor's strikes of two African-American venirepersons; and (3) abused its discretion by permitting the prosecutor to argue in closing argument that Defendant was "hiding behind" his Spanish interpreter. We affirm.

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

**Factual Background**

In the early morning hours of August 20, 2012, Defendant entered B.J.'s (Victim's) home through the back door. Defendant choked her, beat Victim's head and body with his fists, and beat her on the head with a "very, very hard" object, which Victim later realized to be her hair straightener. Defendant was silent during the attack and did not respond when Victim asked him what he wanted. Eventually, Defendant fled Victim's home, scaling a chain link fence in her back yard. As a result of the attack, Victim suffered lacerations to her head, a broken jawbone and cheekbone, four broken ribs, a lacerated and collapsed lung, a lacerated spleen, a gash on her knee, and a broken finger.

Defendant was subsequently arrested and charged with first-degree assault, armed criminal action based on the first-degree assault charge, and first-degree burglary. At trial, the State produced DNA evidence showing that blood smears found outside Victim's home matched that of the Victim. The State also produced evidence showing that DNA found on the pants Defendant wore on the night of the assault, as well as DNA found on Defendant's flip flop and stocking cap, matched Victim. In his defense, Defendant testified, with the aid of a Spanish interpreter, that he had been drinking the day before the assault and, upon returning to his home, had continued to drink and had fought with his girlfriend over the phone. Defendant further testified that he entered the back door of Victim's home believing it to be his own and when he saw Victim lying on the floor bleeding, he fled.

The jury found Defendant guilty of the crimes charged. The trial court adopted the jury's sentencing recommendation and sentenced Defendant to consecutive terms of 25 years' imprisonment for first-degree assault, five years' imprisonment for armed criminal action, and eight years' imprisonment for first-degree burglary. Defendant appeals.

**Point I: Instructional Error**

In his first point relied on, Defendant claims the trial court plainly erred in submitting Instruction No. 9 for armed criminal action because "because (1) the submitted instruction did not specify the 'dangerous instrument' charged; (2) the State argued that either a hand or a hair straightener could be this dangerous instrument; (3) a hand is not a dangerous instrument; (4) the instruction did not did not ensure that the jury would unanimously convict Appellant of the same conduct[;] (5) whether the victim was struck by a hand or other object was a disputed fact at trial; (6) the lack of a unanimous verdict for the crime of armed criminal action caused a manifest injustice and resulted in a consecutive sentence of five years." In the argument portion of his brief, Defendant explains that Instruction No. 9, which is patterned on Missouri Approved Instruction-Criminal (MAI-CR 3d) 332.02, is not in conformity with this Court's recent decision in *State v. Evans*, 455 S.W.3d 452 (Mo. App. E.D. 2014), and, under certain factual circumstances like the instant matter, allows for verdicts that are not unanimous. The State responds that plain error review is precluded in this case, given that Instruction No. 9 is patterned on the MAI. Even assuming that plain error review is available, the State asserts that the trial court did not plainly err by submitting Instruction No. 9 to the jury.

*Standard of Review*

During the instruction conference, the State proffered Instruction No. 9, which the parties do not dispute is based on MAI-CR 3d 332.02. When the trial court asked defense counsel whether Defendant had any objection, counsel responded "no." Subsequently, the trial court submitted Instruction No. 9 to the jury, which provided:

> As to Count II [armed criminal action], if you find and believe from the evidence beyond a reasonable doubt:

First, that defendant is guilty of the offense of assault in the first degree, as submitted in Instruction No. 5, and

Second, that defendant committed that offense by or with or through the knowing use or assistance or aid of a dangerous instrument,

then you will find the defendant guilty under Count II of armed criminal action.

As used in this instruction, the term "dangerous instrument" means any instrument, article, or substance that, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury.

However, unless you find and believe form the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

Because Defendant did not object to Instruction No. 9, his claim of error on appeal is not preserved. *See State v. Banks*, 434 S.W.3d 100, 102 (Mo. App. E.D. 2014) ("To preserve a claim of instructional error, counsel must make specific objections to the allegedly erroneous instruction at trial and in a motion for new trial."). Unpreserved claims of instructional error may be subject to plain error review. *Id*. We recognize, however, that "[u]se of an approved instruction cannot, by definition, be deemed plain error[,]" *State v. Goodwin*, 891 S.W.2d 435, 438 (Mo. App. W.D. 1994), and, in such instances, plain error review is precluded, *State v. Sanders*, 449 S.W.3d 812, 816 (Mo. App. S.D. 2014). An apparent exception to this rule exists, however, where the MAI is not in "proper form" because it fails to comport with substantive law. *State v. Manuel*, 443 S.W.3d 669, 672-73 (Mo. App. W.D. 2014). That is the type of argument Defendant raises here.

Accordingly, we review Defendant's claim of instructional error for plain error, "which requires a finding of manifest injustice or a miscarriage of justice resulting from the trial court's error." *Banks*, 434 S.W.3d at 102. "To show that the trial court plainly erred in submitting an instruction, the defendant must go beyond a demonstration of mere prejudice, and must establish

4

that the trial judge so misdirected or failed to instruct the jury as to cause manifest injustice or a miscarriage of justice." *Manuel*, 443 S.W.3d at 672 (citation and quotations omitted). "Instructional error rarely rises to the level of plain error and reversal is required only when it is readily apparent that [the alleged] error affected the jury's verdict." *State v. Lucy*, 439 S.W.3d 284, 293 (Mo. App. E.D. 2014).

*MAI-CR 3d 332.02 & Substantive Law*

Resolution of Defendant's claim requires us to first address whether Instruction No. 9 complies with substantive law. The basis for Defendant's argument that MAI-CR 3d 332.02 does not comply with substantive law is this Court's recent decision in *State v. Evans*, *supra*. There, in the context of a sufficiency of the evidence challenge, the Eastern District considered whether a hand or fist can qualify as a "dangerous instrument" in support of a conviction for armed criminal action. *Id.* at 453. After noting that the statute, § 556.061(9) RSMo Supp. 2013, defined "dangerous instrument" for purposes of armed criminal action, as "any instrument, article or substance, which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury," the Court concluded that fists/hands do not qualify as "dangerous instruments." *Id.* at 457.[2] The Court stated,

> We conclude that a reasoned and common-sense reading of the terms "instrument, article or substance" from the definition of "dangerous instrument" indicate an external object or item, rather than a part of a person's body. The most relevant dictionary definition of "instrument" is "a tool or implement, esp. one for delicate or scientific work." . . . . In ordinary language, hands, feet, or other body parts are not commonly referred to as instruments, or even as articles or substances. Thus, a plain and ordinary reading of the terms instrument, article, and substance do not indicate a body part. *Id.* at 458.

---

[2] Section 556.061(9) RSMo Supp. 2009, in effect at the time of the instant crimes, defined "dangerous instrument" using the exact same language.

5

Here, MAI-CR 3d 332.02 defines "dangerous instrument" using language that is identical to the language defining "dangerous instrument" in the statute, *see* § 556.061(9), and does not define "dangerous instrument" to include a hand, fist, or other body part. Because the language of the statute and the language of the MAI are identical, it cannot be said that the MAI is inconsistent with substantive law. Further, the conclusion in *Evans* that "dangerous instrument" as used in § 556.061(9) does not include hands or fists, or any part of the body, does not (contrary to the implications of Defendant's argument on appeal) render the MAI inconsistent with substantive law. Rather, the MAI is in conformity with *Evans'* holding because, a reasonable juror giving the term "dangerous instrument" its common-sense meaning, would not interpret the definition of "dangerous instrument" to include hands or fists. Stated differently, the MAI does not, on its face, allow for a conviction of armed criminal action based on the use of hands, fists, or other body parts as a deadly weapon. Accordingly, we conclude that MAI-CR 3d 332.02, on which Instruction No. 9 was patterned, is in conformity with the law and entirely consistent with *Evans*.

*Submission of MAI-CR 3d 332.02*

Having concluded that MAI-CR 3d 332.02 is consistent with substantive law, we next consider whether, under the facts of this case, the jury was misled by the trial court's instruction as to render a non-unanimous verdict. In this regard, Defendant asserts that the MAI is not in conformity with the law after *Evans*, because in cases like the instant matter, its broad language allows for non-unanimous verdicts. Defendant explains that under the facts of this case—where the question whether Victim was beat with fists versus a hair straightener was contested, where the prosecutor argued that both fists and the straightener qualified as a "dangerous instrument," and where the jury questioned whether fists were "dangerous instruments" during

6

deliberations—some of the jurors may have believed that Defendant beat Victim with his fists, but others may have believed Defendant beat Victim with the straightener.

Here, the trial court specifically instructed the jury, in Instruction No. 18, that the attorneys' arguments "are intended to help . . . in understanding the evidence and applying the law, but they are not evidence" and that the jury's deliberations are "to be governed . . . [by] the law as given in these instructions."  Regarding the trial court's submission of Instruction No. 9, it is undisputed that this instruction was patterned on MAI-CR 3d 332.02, which defined "dangerous instrument" to be "any instrument, article, or substance that, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury."  After the trial court submitted these, and other instructions, to the jury, the parties made their closing arguments, in which the prosecutor argued that both a fist and hair straightener qualified as a "dangerous instrument" for purposes of armed criminal action.  Subsequently, when the jury asked during deliberations whether a fist qualifies as a dangerous instrument, the trial court declined to answer the question and specifically referred the jury back to the written instructions.

As the record demonstrates, the trial court provided the jury with a verdict director for armed criminal action that is consistent with substantive law.  As explained, that instruction, by its plain terms, does not allow for an armed criminal action conviction based on the use of a defendant's hands, fists, or other body part.  The trial court also instructed the jury that it was to follow the written instructions during its deliberations, not the parties' arguments, and further instructed the jury in response to its question whether fists qualified as a "dangerous instrument," that it was to follow the written instructions given.  It is well-established the jurors are presumed to follow the instructions provided.  *State v. McFadden*, 391 S.W.3d 408, 424 (Mo. banc 2013).  Accordingly, because it is presumed that jurors follow their instructions, we must presume that

7

the jurors, in finding Defendant guilty of armed criminal action based on first-degree assault, unanimously believed that Defendant beat Victim with a hair straightener.

The factual aspects of this case that Defendant highlights do not rebut this presumption. Defendant notes that whether Victim was beat with fists versus a hair straightener was contested, that the prosecutor argued that both fists and the straightener qualified as a "dangerous instrument," and that the jury questioned whether fists were "dangerous instruments." These facts do not logically lead to the conclusion that the *trial court's instructions* mislead the jury such that its verdict was non-unanimous. *See McFadden*, 391 S.W.3d at 420-21 (rejecting defendant's argument that prosecutor's misstatement of law misled the jury, as the instructions were correct and juries are presumed to follow the instructions); *see also State v. Riley*, 440 S.W.3d 561, 567-68 (Mo. App. E.D. 2014) (rejecting claim that prosecutor's statements violated right to unanimous jury verdict because instruction was proper and jurors are presumed to follow the instructions). Rather, when viewed objectively, the reasonable inference from the record is that the prosecutor's closing argument caused the jury some confusion with respect to Instruction No. 9, which led it to ask a question during deliberations.[3] As noted, the trial court clearly directed the jurors back to Instruction No. 9, which does not, by its plain terms, allow an armed criminal action conviction based on the use of a "fist" as a dangerous instrument. *See Evans*, 455 S.W.3d at 458. Further, that the jury asked a question regarding whether a fist qualifies as a dangerous instrument, does not, contrary to Defendant's argument, show that the trial court misled the jury such that its verdict was non-unanimous. Indeed, Defendant cites no authority in support of this proposition.

---

[3] This Court certainly does not condone the State's overreaching statement in closing argument that a fist would qualify as a dangerous instrument.

8

Accordingly, we conclude that Defendant has not rebutted the presumption that the jury followed the instructions given, as to show that the jury's verdict was not unanimous. Defendant has not established any instructional error, plain or otherwise. Point I denied.

## Points II & III: *Batson* Challenges

Defendant's second and third points relied on claim that the trial court clearly erred by overruling his *Batson* objections to the prosecutor's peremptory strikes of two African-American venirepersons, Fran Collier and Donna Cannon. The State generally responds that the trial court's rulings were not erroneous because Defendant failed to establish that the prosecutor's reasons for the strikes were pretextual.

### *Standard of Review*

When reviewing a trial court's *Batson* challenge decision, this Court accords its findings great deference because those findings are largely dependent on credibility evaluations. *State v. Washington*, 288 S.W.3d 312, 314 (Mo. App. E.D. 2009). This Court will overturn the trial court's ruling on a *Batson* challenge only upon a showing of clear error. *State v. McFadden*, 191 S.W.3d 648, 651 (Mo. banc 2006). "A finding is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been made." *Id*.

### *Venireperson Collier*

In his second point relied on, Defendant asserts that the trial court clearly erred by overruling his *Batson* objection to the prosecutor's peremptory strike of venireperson Collier because the proffered reason for the strike—that she had a brother-in-law and husband who had been previously incarcerated and would cause her to view the prosecutor's office negatively— was pretextual. In support, Defendant points out that similarly situated white jurors were not

9

struck, Collier reported a positive experience with the "prosecutor's office," and the prosecutor disproportionately struck African-American venirepersons.

"Under the Equal Protection Clause, a party may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race." *State v. McFadden*, 369 S.W.3d 727, 739 (Mo. banc 2012) (citation and quotations omitted). Therefore, a peremptory challenge that is motivated by gender, ethnicity, or race violates a defendant's and the venireperson's equal protection rights. *See id.* If a defendant suspects that such a prohibited basis exists for the State's strike, then the defendant can make a *Batson* objection to challenge the strike. *State v. Dow*, 375 S.W.3d 845, 848 (Mo. App. W.D. 2012). Three procedural steps are followed when a defendant raises a race-based *Batson* challenge: "(1) the defendant raises a *Batson* challenge with respect to a specific venireperson struck by the State, identifying the cognizable racial group to which that person belongs; (2) the State must supply a reasonably specific and clear race-neutral reason for the challenged strike; and (3) if the State provides an acceptable reason for the strike, then the defendant must show that the State's given reason or reasons were merely pretextual and that the strike was racially motivated." *State v. Johnson*, 207 S.W.3d 24, 35 (Mo. banc 2006).

In determining pretext, the primary consideration is the "plausibility of the prosecutor's explanations in light of the totality of the facts and circumstances surrounding the case." *Id.* Factors that a court considers in determining pretext include: (1) whether a similarly situated white juror was not struck; (2) the "degree of logical relevance between the proffered explanation and the case to be tried[;]" and, (3) "the prosecutor's credibility based on his or her demeanor or statements made during voir dire and the court's past experiences with the prosecutor." *State v. Strong*, 142 S.W.3d 702, 712 (Mo. banc 2004) (citation and quotations

10

omitted). Other "[o]bjective factors bearing on the [S]tate's motive to discriminate . . . [include] conditions prevailing in the community and the race of the defendant, the victim, and the material witnesses." *State v. Bateman*, 318 S.W.3d 681, 691 (Mo. banc 2010). A disproportionate number of strikes against other minority venirepersons or number of venirepersons remaining after completion of peremptory strikes may also be considered. *Id*. This Court accords great deference to the trial court's determination of pretext because the trial court is in a better position to evaluate the credibility and demeanor of the prosecutor, as well as the venirepersons. *State v. Murphy*, 443 S.W.3d 721, 725-726 (Mo. App. E.D. 2014); *State v. Nylon*, 311 S.W.3d 869, 882 (Mo. App. E.D. 2010).

Here, Defendant met the first step with respect to venireperson Collier, namely by identifying Collier as an African-American female and implying that the prosecutor had exercised his peremptory strikes to remove members of that group from the jury. Thereafter, the prosecutor provided a race-neutral reason for the strike. The prosecutor explained that Collier's husband had been prosecuted by his office and had served a term of imprisonment. "[H]aving an incarcerated family member is a race-neutral reason for a peremptory strike." *State v. Clark*, 407 S.W.3d 104, 108 (Mo. App. E.D. 2013) (citing *State v. Cole*, 71 S.W.3d 163, 173 (Mo. banc 2002)). Because the prosecutor provided a race-neutral reason for the strike, the burden shifted to Defendant to demonstrate that the prosecutor's reasoning was merely a pretext for racial discrimination. *See Johnson*, 207 S.W.3d at 35. Defendant asserted, as he does on appeal, that the prosecutor's reason for striking Collier is pretextual because her husband's drug offense occurred in the late 1980s, other white female venirepersons, Rebecca Harris and Pamela Hardy, were similarly situated because Harris had a nephew in county jail and Hardy had nephews who had been to prison and another in county jail, and the prosecutor disproportionately struck

11

African-American venirepersons. The trial court concluded that the prosecutor's reason for striking Collier was not pretextual.

Regarding Defendant's assertion that similarly situated jurors were not struck, we believe that having a close family member previously incarcerated, who was prosecuted by the same office prosecuting the instant case, is different than having a distant relative either spend the night in jail or go to prison. *See cf. State v. Murray*, 428 S.W.3d 705, 713 (Mo. App. E.D. 2014) (distinguishing between venirepersons with family members charged with a crime versus actually convicted of a crime). Differences in degree of familial relation and terms of confinement aside, nothing in the record indicates that Harris' nephew's offense arose in the City of St. Louis, such that Harris would have any reason to unfavorably view the State's case. Similarly, Hardy's nephews were prosecuted in Jefferson County. And, neither Harris nor Hardy indicated that they visited their nephews while confined. Comparatively, that Collier visited her husband while incarcerated, indicating a close relationship, and that her husband was prosecuted by the same office pursing Defendant's convictions, could reasonably cause Collier to view the State's case unfavorably, despite the fact that the incident occurred in the late 1980s. Defendant, therefore, did not demonstrate that a venireperson similarly situated to Collier was not struck.

While the absence of a similarly situated white juror who was not struck is not dispositive in determining pretext, *see Murphy*, 443 S.W.3d at 725, the other factors Defendant raises do not indicate that the prosecutor's peremptory strike of Collier was based on racial animus. Defendant does not explain how the fact that Collier's husband's was incarcerated over twenty years ago renders the prosecutor's strike discriminatory, nor how the prosecutor's decision to use four of its six strikes against African-Americans demonstrates pretext. Indeed, absent from the record is any indication that the State acted on a pattern of discrimination in striking Collier.

On appeal, Defendant additionally explains that because Collier reported a positive experience with the prosecutor's victim's assistance office when her husband was the victim of a crime, that the State's concern that Collier had "issues" with his office was "transparently pretextual." That Collier had a positive experience with the victim's assistance office, does not necessarily mean that she viewed the Circuit Attorney's office similarly. In any case, Defendant did not make this argument to the trial court and we will not find error based on an argument that the trial court was not afforded an opportunity to consider. *Murray*, 428 S.W.3d at 714.

In sum, considering the totality of the circumstances, we cannot conclude that the trial court clearly erred by denying Defendant's challenge to the prosecutor's strike of venireperson Collier. Point II denied.

*Venireperson Cannon*

In her third point relied on, Defendant asserts that the trial court clearly erred by overruling his *Batson* objection to the prosecutor's peremptory strike of venireperson Cannon because the proffered reason for the strike—"that her husband and son had been previously incarcerated and may cause her to view the prosecutor's office negatively"—was pretextual.[4] In support, Defendant points out that white jurors not struck had nephews in jail, that the prosecutor did not know whether its office had prosecuted Cannon's husband and stepson, and that the State disproportionately struck African-American venirepersons.

Defendant met the first *Batson* challenge requirement with respect to venireperson Cannon, by identifying her as an African-American female and implying that the prosecutor had exercised his peremptory strikes to remove members of that group from the jury. Thereafter, the prosecutor provided a race-neutral reason for the strike: That Cannon's husband and stepson

---

[4] Defendant misstates the record, as venireperson Cannon reported that her husband and *stepson* were *currently* incarcerated for charges arising out of St. Louis County.

were currently incarcerated in St. Louis County. "[H]aving an incarcerated family member is a race-neutral reason for a peremptory strike." *Clark*, 407 S.W.3d at 107 (citing *Cole*, 71 S.W.3d at 173). Because the prosecutor provided a race-neutral reason for the strike, the burden shifted to Defendant to demonstrate that the State's reasoning was merely a pretext for racial discrimination. *See Johnson*, 207 S.W.3d at 35. In this regard, Defendant asserted that the prosecutor's strike was pretextual because similarly situated white female jurors, Harris and Hardy, were not struck and because the State disproportionately struck African-American venirepersons. The trial court determined the strike was not pretextual.

Again, having a close family member incarcerated is different than a distant family member spending the night in jail. *See cf. Murray*, 428 S.W.3d at 713. Indeed, as the State points out, Cannon was the only venireperson who had close family members currently incarcerated, of whom she visited regularly and, as such, Defendant did not show that another venireperson was similarly situated. As a result of her immediate family members' incarceration and her close connection to them, as demonstrated through her regular visitation with them, the prosecutor may have reasonably believed that Cannon could have a reason to view the State's case unfavorably.

Further, the other factors Defendant raises do not establish pretext. Although the State used four of its six strikes against African-Americans, four of the twelve remaining jurors were African-American and Defendant does not explain how the distribution of strikes renders the prosecutor's strike of Cannon discriminatory. Defendant also does not explain how the prosecutor's lack of knowledge about whether its office prosecuted Cannon's husband and son contributed to the prosecutor's alleged discriminatory strike.[5] There are otherwise no indications

---

[5] Moreover, Defendant did not raise this factor before the trial court and we will not find error based on an argument that the trial court was not afforded an opportunity to consider. *Murray*, 428 S.W.3d at 714.

14

on the record that the State acted on a pattern of discrimination in striking Cannon. As we afford great deference to the trial court's determination whether the prosecutor's strike is pretextual, we conclude, given the totality of the circumstances, that the trial court did not clearly err in its decision to accept the prosecutor's reason for striking Cannon. Point III denied.

### Point IV: Closing Argument

In his fourth point relied on, Defendant claims the trial court abused its discretion by overruling his objection to the prosecutor's closing argument, which stated that Defendant, by using an interpreter at trial, was "hiding behind" and "hiding between" the Spanish interpreter and did not really need one. According to Defendant, this argument "invited the jury to draw an adverse inference based on [Defendant] being a Spanish speaking person, based on [Defendant's] national origin, and based on his immigration status, and was an attempt to stoke the hostilities of the jury against [Defendant] based on these improper considerations." [6] The State responds that the trial court did not abuse its discretion by overruling Defendant's objection. The State asserts that its argument was not improper and did not prejudice Defendant.

"A trial court maintains broad discretion in the control of closing arguments." *State v. Edwards*, 116 S.W.3d 511, 537 (Mo. banc 2003). Statements made during closing argument must be viewed in context of the entire record. *Id*. The trial court's rulings with respect to the scope of closing argument "will be cause for reversal only upon a showing of abuse of discretion resulting in prejudice to the defendant[,]" *i.e.*, that the outcome of the trial would have been different had the error not be made. *State v. Deck*, 136 S.W.3d 481, 488 (Mo. banc 2004); *State v. Deck*, 303 S.W.3d 527, 540 (Mo. banc 2010).

---

[6] In the argument portion of his brief, Defendant suggests that the State improperly invited the jury to draw an adverse inference from Defendant's exercise of a constitutional right. Defendant does not identify the constitutional right invoked. Aside from his failure to develop this argument, it is also not encompassed by the point relied on nor was it raised before the trial court. Therefore, we consider this argument abandoned. *See* Rule 84.04(e); *State v. Mason*, 428 S.W.3d 746, 753 n. 6 (Mo. App. E.D. 2014).

The defense theory in its closing argument was that Defendant's version of events was credible, whereas the testimonies of Victim and the officers was not believable and that the DNA evidence connecting Defendant to the crime did not support that Defendant committed the crimes. In his rebuttal closing argument, the prosecutor sought to rehabilitate Victim's testimony by attacking Defendant's credibility. The prosecutor argued:

> [The State]: And what do we have to refute the victim? The asinine story of the defendant who got up here, sat here and told you all this detail, I played soccer, I did this, I did that, and then he hides between the translator because what he did numerous times throughout the trial –
>
> [Defense counsel]: Objection, your Honor, it's completely inappropriate to suggest he's hiding behind a translator. There's been no evidence of that. He has the right to have a translator and that's inappropriate, your Honor.
>
> THE COURT: Overruled.
>
> [The State]: I asked him on a couple of occasions, you all remember that? Please wait for your translator to answer because he was answering my questions and he did it on his own counsel's questions. You make up your mind. Was he hiding behind the interpreter because he's not speaking very well, but the fact of the matter is he understood what was going on.

Generally, "[a] prosecuting attorney should not inflame the passions or prejudices of the jury against a defendant." *State v. Douglas*, 720 S.W.2d 390, 393 (Mo. App. S.D. 1986). Arguments designed to induce a jury to act on passion or prejudice may include personal attacks or the invocation of personal epithets, speculation about future crimes the defendant might commit, or statements designed to make the jury fear a defendant, such as arguments that ask the jury to put themselves in the victim's place. *State v. Banks*, 215 S.W.3d 118, 121 (Mo. banc 2007) (personal attacks); *State v. Storey*, 901 S.W.2d 886, 901 (Mo. banc 1995) (personalized arguments); *State v. Swenson*, 551 S.W.2d 917, 919 (Mo. App. 1977) (personal epithets and speculation about future crimes).

16

Here, the prosecutor's comments, when read in context, were designed to attack Defendant's credibility. As noted, the prosecutor made the comments in his rebuttal closing argument, which indicates an intention to rehabilitate Victim's version of events by arguing that Defendant's testimony should not be believed. In essence, the prosecutor was arguing that Defendant was a liar, *i.e.,* Defendant represented that he only spoke Spanish and needed an interpreter and, yet, was able to understand and answer questions during examination without the interpreter's help. Commentary on a defendant's credibility is proper in a prosecutor's closing argument. *See State v. Washington*, 444 S.W.3d 532, 540-41 (Mo. App. E.D. 2014) ("[A prosecutor] may comment on . . . the credibility of the defendant's case [and] may even belittle and point to the improbability and untruthfulness of specific evidence." (citation and quotations omitted)).

Defendant's contrary assertion, that the comments were made to inflame the jury's passion and to encourage punishment based on Defendant's national origin and the fact that he is a Spanish speaker, is not supported by the record. Defendant points out that several "potential jurors" made disparaging comments regarding illegal immigrants during voir dire and that the State asked about Defendant's immigration status during the penalty phase of the trial.[7] These facts do not show that the jury, as result of the State's rebuttal closing argument, acted on personal animus when deliberating as to Defendant's guilt. Defendant has not met his burden of showing that the State's argument affected the jury's verdict.

In sum, the State's closing argument was proper and the trial court did not abuse its discretion by permitting the argument. Point IV denied.

---

[7] In his brief, Defendant asserts that the prosecutor twice attempted to introduce irrelevant evidence about Defendant's immigration status. Defendant again misstates the record, as the prosecutor only sought to introduce testimony of Defendant's immigration status during the penalty phase of the trial.

17

## Conclusion

The judgment of the trial court is affirmed.

_____
Philip M. Hess, Judge

Sherri B. Sullivan, P.J. and
Mary K. Hoff, J. concur.

18