

# In the Missouri Court of Appeals Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | ED101198 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | 1122-CR07352-01 |
| | ) | |
| RUFUS LITTLE, | ) | Honorable Mark H. Neill |
| | ) | |
| Appellant. | ) | FILED: September 1, 2015 |

## Introduction

Rufus Little (Defendant) appeals from the sentence and judgment entered following a jury trial convicting him of assault in the second degree and child abuse. On appeal he asserts the trial court erred in denying his motion to suppress, failing to quash the entire venire panel, and finding him to be a prior and persistent offender. We affirm.

## Background

The State charged Defendant as a prior and persistent offender with the class A felony of assault in the first degree (Count I) and the class C felony of abuse of a child (Count II), stemming from an incident when Defendant caused serious physical injury to his three-month-old son (K.L.) by shaking him. Before trial, Defendant filed a motion to suppress his statements made before and after his arrest, asserting his statements were not voluntary in that the

interrogation was coercive and he was not advised of his Miranda rights.[1] The trial court heard arguments on the motion to suppress where the following evidence was adduced.

Sergeant Jason Albers (Sergeant Albers) and Officer William Stevenson (Officer Stevenson) of the St. Louis Metropolitan Police Department testified that on December 11, 2011, they came to Defendant's home after medics had called to report possible child abuse. Officer Stevenson secured the scene and Sergeant Albers told Defendant about the report of abuse and asked Defendant "some questions about what happened." Sergeant Albers did not Mirandize Defendant before asking the questions. He did not handcuff Defendant because he "had no reason to," noting that he "didn't really know what was going on, other than ... just [wanting] to contain the scene, if there was a scene." He did not tell Defendant he could not leave but he told Defendant that some detectives would want to speak with him. While they waited for the detectives, Defendant made phone calls and moved about his home.

Also at the suppression hearing, Detective Daniel Fox (Detective Fox) testified to the following. He was a homicide detective for the St. Louis Metropolitan Police Department, and on December 11, 2011, he received a request for a homicide detective following an injury to a child. He and Detective Joseph Lankford went to the hospital to assess K.L.'s condition, and the doctor attending K.L. told the detectives that K.L. had serious bleeding in his brain and was not expected to survive. The doctor also told the detectives he suspected K.L. had fractured ribs[2] and that K.L.'s injuries might be the result of abuse. No one suggested shaken baby syndrome specifically.

---

[1] Miranda v. Arizona, 384 U.S. 436, 444 (1966) (holding that custodial interrogation by police must not occur prior to suspect being informed of his or her right to counsel and against self-incrimination).

[2] While initial x-rays showed fractured ribs, a second examination of the x-rays the following morning reveals that K.L. did not in fact have broken ribs.

2

The detectives then went to Defendant's home where Defendant was with Sergeant Albers and Officer Stevenson. Detective Fox told Defendant that the police were investigating K.L.'s injury and asked Defendant to reenact briefly on camera what happened, in order to determine if there was a non-criminal explanation for K.L.'s injuries or if Defendant had been the only person present when the injury occurred. The video of the reenactment was 90 seconds long. Because Defendant revealed he was the only adult home and because his explanation did not account for K.L.'s injuries, Detective Fox requested that Sergeant Albers and Officer Stevenson place Defendant under arrest and bring him to the station for further questioning.

Once at the station, Detective Fox began the interrogation by reading Defendant his Miranda rights and asking him to explain in more detail what happened that night with K.L. Detective Fox testified that during his interrogation of Defendant, he did not threaten Defendant with the death penalty, did not make Defendant any promises, and did not knowingly lie to him. Defendant confessed to shaking K.L. and causing his injuries. After the suppression hearing, the trial court took the matter under advisement and before the start of trial denied Defendant's motion to suppress his statements to the police.

During *voir dire*, venireperson Annette Frazier (Frazier) identified herself as a caseworker for the Missouri Department of Social Services, Children's Division (Children's Division), and stated she worked with abused and neglected children. She stated she recognized the name of D.L., a potential witness in the case, and believed the children in the family were on her caseload. The trial court called Frazier to the bench where she clarified that although she knew she had a child named D.L. on her caseload, she was not positive that D.L. was the same D.L. who was a potential witness in this case, and she was not positive the children were in foster care. Counsel for Defendant then requested that the trial court strike the entire venire

3

panel in light of Frazier's comment in front of the venire panel that D.L. and R.L. were in foster care. The trial court denied the request, noting that Frazier did not say the children were in foster care, but merely that she had them on her caseload.

At trial, the evidence revealed that on the night of December 11, 2015, Defendant called 911 to report that his 3-month-old son, K.L., was unresponsive. The emergency medical technician (EMT) arriving at the scene noted bruises on K.L.'s head, ligature marks around his neck, petechial in his eyes, which is a sign of asphyxiation, and that K.L.'s eyes were pointing to the left, which indicated a brain injury. From these physical indications, the EMT suspected shaken baby syndrome, which he whispered to his partner and to the firefighters at the scene. The EMT took K.L. to the hospital and Defendant remained home with his other children, R.L. and D.L.[3] The pediatric critical care doctor who treated K.L. when he arrived at the hospital diagnosed K.L. with non-accidental trauma to his brain. The pediatric neurologist who treated K.L. testified that his injuries were consistent with having been shaken.

After Defendant was arrested and taken to the station for questioning, Detective Fox videotaped Defendant's entire four-hour detainment in the interrogation room. Defendant was handcuffed during the interrogation period by a long chain from one wrist to the floor. Over a period of four hours and twenty minutes, Detectives Fox and Lankford interviewed Defendant three times for approximately an hour total of interrogation time. Detective Fox gave Defendant Miranda warnings at the start of the interrogation but not again after each break. Detective Fox explained to Defendant that he had been arrested because his earlier explanation for what happened did not match K.L.'s injuries, which were broken ribs inconsistent with CPR and blood in his brain. Defendant was surprised by the report of broken ribs and posited that he could have

---

[3] Defendant lived in a duplex above his mother-in-law, and by the time Sergeant Albers and Officer Stevenson arrived, R.L. and D.L. had gone to their grandmother's home and Defendant was alone.

4

done that while trying to resuscitate K.L. When the detectives asked Defendant if it was possible that he squeezed K.L. too hard due to the nerve damage in his hands,[4] Defendant agreed it was possible he did so by accident while trying to calm K.L.'s crying before he went to bed. Defendant denied shaking K.L. or being rough with him. Defendant provided the same explanation he had before: that K.L. had had vaccinations earlier that day and was fussy, that he had discovered K.L. unresponsive about an hour and a half after putting him down to sleep, and that approximately one week earlier, K.L. had fallen off the bed and hit his head.

Detective Fox challenged Defendant that K.L.'s injuries had occurred that night and Defendant was the only person in the home capable of inflicting the injuries. He warned that if K.L. died of his injuries and Defendant had not provided an explanation for his mindset, he would have to assume the injuries to K.L. were intentional, in which case Defendant would be charged with the highest level of charge, which was first-degree murder. When asked if he knew what the sentence was for first-degree murder, Defendant responded that it was the death penalty. Detective Fox told Defendant he needed to explain if the injuries were an accident because then they would be "looking at something very different from murder first." Defendant then acknowledged he shook K.L. "a little" while he was trying to calm him down and that K.L.'s head was bouncing. Finally, Defendant admitted that he was overwhelmed and had been frustrated with his older two children, R.L. and D.L., and that he lost control and "exploded," taking his frustration out on K.L., who had been crying. Defendant was adamant that he did not mean to shake K.L. or to harm him, and that he did not realize he had injured K.L. until he discovered K.L. unresponsive an hour and a half later.

---

[4] Defendant received disability benefits because of the lasting nerve damage in his hands as a result of chemotherapy treatment for cancer.

At the prior and persistent hearing, the State entered exhibits 100 and 101, authenticated copies of court records from Virginia stating Defendant pled guilty to felony possession of cocaine on July 24, 2001 in the Circuit Court of the City of Norfolk, Virginia, and to felony possession of cocaine on February 27, 2002 in the Circuit Court of Virginia Beach, Virginia. Counsel for Defendant did not object to the admission of these records and acknowledged Defendant was represented by counsel in the records. Defendant agreed he had entered pleas of guilty to two separate felony charges of possession of cocaine and admitted he had two prior convictions in Virginia. Accordingly, the trial court found Defendant to be a prior and persistent offender.

The jury found Defendant guilty of the lesser-included offense of second-degree assault and abuse of a child. Defendant does not challenge the sufficiency of the evidence supporting his conviction. The trial court sentenced Defendant to concurrent terms of seven years in the Missouri Department of Corrections on each count. This appeal follows.

## Discussion

### Point One

In his first point on appeal, Defendant claims the trial court erred in denying his motion to suppress all of his statements to the police because the interrogations violated his right against interrogation without proper Miranda warnings, in that the police did not Mirandize him before his first interrogation and then used statements from the first interrogation to get a confession in his second interrogation. We disagree.

We review a trial court's decision to grant or deny a motion to suppress only for whether it was supported by substantial evidence, and we view the facts and any reasonable inferences from those facts in the light most favorable to the trial court's ruling. State v. Selvy, 462

6

S.W.3d 756, 764 (Mo. App. E.D. 2015). Where the trial court makes no findings of fact or credibility determinations, we presume the court found all facts and made all credibility determinations in accordance with its ruling. Id. We will not reweigh the evidence, and if the trial court's ruling is plausible in light of the entire record, we will not reverse. Id. Questions of law, however, we review *de novo*. State v. Rousan, 961 S.W.2d 831, 845 (Mo. banc 1998). Whether a suspect was in custody is an issue of law that we review *de novo*. State v. Brooks, 185 S.W.3d 265, 274 (Mo. App. W.D. 2006).

Defendant argues that the questions the police asked him at his home before his arrest constituted a custodial interrogation for which he was not Mirandized. He further argues that because the police then used these answers to get a confession in his second interrogation, all of his statements to the police should have been suppressed. These are separate issues that we address in order. First, Defendant was not subject to a custodial interview in his home. The police "are not required to administer Miranda warnings to everyone whom they question." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). Rather, Miranda warnings are required only once a person is subject to a custodial interrogation. See Miranda v. Arizona, 384 U.S. 436, 444 (1966). A custodial interrogation is where the accused is formally arrested or subjected to arrest-like restraints. State v. Glass, 136 S.W.3d 496, 508 (Mo. banc 2004). To determine if a person is in custody, "[w]e look to the totality of the circumstances, including the accused's actual and perceived freedom to leave, and the purpose, location, and length of the interrogation." Brooks, 185 S.W.3d at 274.

Here, the police questioning at Defendant's home did not constitute a custodial interrogation and thus no Miranda warnings were required. Defendant was not handcuffed, and he was free to move around the house and make phone calls, which he did. While there was a

7

constant police presence, at no point did the police draw their weapons or make threats, no police officer told Defendant he could not leave, and it does not appear from the record that there were ever more than four officers present. See Glass, 136 S.W.3d at 508-09; Brooks, 185 S.W.3d at 274 (in determining if suspect was in custody, courts consider whether suspect possessed unrestrained freedom, whether strong-arm tactics or deception were employed, and whether atmosphere of questioning was police dominated). Moreover, Defendant here voluntarily acquiesced to questioning, which the record shows never went further than asking Defendant what happened and who was there. See id. (considering whether suspect voluntarily acquiesced to police requests for questioning and whether suspect initiated contact with police). Asking "what happened" is a preliminary investigatory inquiry that does not fall under Miranda. Miranda, 384 U.S. at 477-78 ("General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding."); see also State v. Allred, 338 S.W.3d 375, 379 (Mo. App. S.D. 2011). We note that when an infant is admitted to the hospital with serious injuries, it is unreasonable for the adult in charge not to expect some basic inquiry by the police about what happened.

While Defendant asserted in oral argument that an EMT told him to stay at home, the record does not show that Defendant made this assertion to the trial court in his motion to suppress or at the suppression hearing. At the suppression hearing, three police officers testified and all denied telling Defendant that he could not leave, and Defendant did not assert that anyone told him he could not leave. Issues and evidence not presented to the trial court are not reviewable on appeal. State v. Jackson, 141 S.W.3d 391, 395 (Mo. App. S.D. 2004).

Second, contrary to Defendant's arguments on appeal, Detective Fox did not perform the type of two-step interrogation that the U.S. Supreme Court found impermissible in Missouri v.

8

Seibert, 542 U.S. 600 (2004). In Seibert, the officer testified at the suppression hearing that during a custodial interrogation, he made a conscious decision to withhold Miranda warnings to get incriminating evidence, after which he gave Miranda warnings and repeated the questions to elicit the same incriminating response. Id. at 605-06. Here, however, Detective Fox testified that his intent in asking Defendant what happened was to determine if there was a non-criminal explanation for K.L.'s injuries, such as a fall, or if there were other potential suspects to interview. He did not in fact elicit any incriminating statements from Defendant until after issuing Miranda warnings. See State v. Wilson, 449 S.W.3d 803, 808-09 (Mo. App. E.D. 2014) (no error in admitting confession when officer asked general questions before reading Miranda warnings and suspect did not actually make incriminating statements until after receiving warning).

Police gave Miranda warnings here when they were required and there was no error in admitting Defendant's statements to the police. There was substantial evidence supporting the trial court's decision denying Defendant's motion to suppress, and thus no error occurred. Point denied.

### Point Two

In his second point on appeal, Defendant claims the trial court erred in denying his motion to suppress all of his statements to police because the interrogation violated his rights against coercive interrogation, in that the police used improper promises of leniency and threats of capital punishment to obtain a confession. We disagree.

Again, we review the trial court's ruling on a motion to suppress only for whether the ruling was supported by substantial evidence. Selvy, 462 S.W.3d at 764. Defendant here argues his confession was rendered involuntary by the detectives' threats and promises. "The test for

whether a statement is voluntary 'is whether the totality of the circumstances created a physical or psychological coercion sufficient to deprive the defendant of a free choice to admit, deny or refuse to answer the examiner's questions' and 'whether the physical and psychological coercion was of such degree that the defendant's will was overborne at the time he [made the statement].'" State v. Hicks, 408 S.W.3d 90, 95 (Mo. banc 2013) (citations omitted).

We have reviewed the video of Defendant's custodial interrogation and confession. Considering the evidence in the light most favorable to the trial court's decision, we do not find, under the totality of the circumstances, Defendant was deprived of a free choice to admit, deny, or refuse to answer the detectives' questions. See Hicks, 408 S.W.3d at 95; Selvy, 462 S.W.3d at 764. At the beginning of the interrogation, police Mirandized Defendant and at no point did he request an attorney or suggest that he wished to stop the questioning. The questioning was not unduly long: Defendant was in the interrogation room for approximately four hours and twenty minutes in total and was subject to questioning for approximately one hour. The detectives were unfailingly polite and sympathetic to Defendant. They did not raise their voices nor threaten him with physical harm. The detectives stated that if K.L. died and Defendant did not provide an explanation for how the injuries occurred, they would have to assume the injuries were intentional and would then constitute first-degree murder, which Defendant recognized carried the death penalty. This statement did not constitute a threat. Observations about the possible consequences of a crime are not threats. State v. Simmons, 944 S.W.2d 165, 176 (Mo. banc 1997). The detectives then explained that if, as they suspected, Defendant had accidentally injured K.L., that would not constitute first-degree murder. This statement was not a promise of leniency but a statement of the law and encouragement to cooperate. Id. at 175 (statements by officer that cooperation is in defendant's best interests are not improperly coercive and do not

10

render confession involuntary). The evidence here demonstrates that Defendant knowingly and voluntarily waived his <u>Miranda</u> rights and confessed to losing control and shaking his son, causing grave injury.

Accordingly, we find that substantial evidence supported the trial court's ruling denying the motion to suppress Defendant's incriminating statements to the police. Point denied.

Point Three

In his third point, Defendant argues the trial court erred in failing to quash the entire venire panel when Frazier identified herself as a Children's Division caseworker and then stated she believed Defendant's children were on her caseload. He argues this suggested that a State agency had already made a finding of guilt, thus prejudicing the entire venire panel against Defendant. We disagree.

We review for an abuse of discretion the trial court's determination of whether an entire venire panel should be dismissed. <u>State v. Polk</u>, 415 S.W.3d 692, 695 (Mo. App. E.D. 2013). To justify striking an entire venire panel, the trial court must decide if the venire person's comments were "so inflammatory and prejudicial" as to taint the entire jury panel and thus deprive the defendant of a fair trial. <u>State v. Sprinkle</u>, 122 S.W.3d 652, 668-69 (Mo. App. W.D. 2003). The trial court is in the best position to determine the effect of the comments on the jury. <u>Id.</u> at 669.

Initially, we note that although Defendant argues on appeal that the private sidebar conversation was broadcast to the entire venire panel, that assertion is not supported by the record. Rather, the record shows that during *voir dire* counsel objected to Frazier's public statement made prior to the sidebar discussion and did not allege that the private sidebar conversation was accidentally broadcast to the panel. Here, the prosecutor read a list of names of

11

potential witnesses, including D.L. and R.L., and asked if any venire members recognized the names. Frazier said she recognized the name D.L. and believed she had the children on her caseload. The subsequent sidebar conversation revealed that she was not sure it was the same D.L. or whether the children were even in foster care. Counsel for Defendant requested a new panel based on Frazier's initial statement before the sidebar discussion "that [D.L.] and [R.L.] are in care."

The trial court quite rightly pointed out that Frazier did not say the children were in care but said they were on her caseload, which was different. This comment was on its face not "so inflammatory and prejudicial" to deprive Defendant of a fair trial. Defendant was charged with abuse of a child, and so the jury could naturally infer the Children's Division was investigating the situation. See State v. Johnson, 461 S.W.3d 842, 845 (Mo. App. E.D. 2015) (recognizing that jurors may exercise common sense when evaluating evidence). Moreover, any statement to the venire panel that the children were receiving services from the State was cumulative to the evidence presented at trial that the children were in fact receiving services from the State. Thus, Frazier's statement would not have so prejudiced the venire panel against Defendant as to deny him a fair trial. See Allred, 338 S.W.3d at 379 (no prejudice results from admission of statements that were cumulative to other evidence presented at trial).

The trial court did not abuse its discretion in declining to quash the entire venire panel. Point denied.

## Point Four

In his fourth point on appeal, Defendant claims the trial court erred in finding him to be a prior and persistent offender because the State did not prove beyond a reasonable doubt that his two prior convictions were for crimes that occurred at different times. We find no error.

12

Defendant did not object to the trial court finding he was a prior and persistent offender at trial or in his motion for new trial, and thus his point is not properly preserved. State v. Page, 309 S.W.3d 368, 372 (Mo. App. E.D. 2010). We have, however, the discretion to review unpreserved claims of error for plain error. Mo. R. Crim. P. 30.20 (2015). Under plain-error review, we will reverse only if a plain error affecting substantial rights results in manifest injustice or a miscarriage of justice. State v. Floyd, 347 S.W.3d 115, 123-24 (Mo. App. E.D. 2011). We review for plain error using a two-step analysis. First, we determine whether the record facially establishes substantial grounds to believe plain error occurred, which is error that is evident, obvious, and clear. If so, we then consider whether the error resulted in manifest injustice or a miscarriage of justice. Id. Plain error review requires that the alleged error have a decisive effect on the jury's determination. See State v. White, 247 S.W.3d 557, 563 (Mo. App. E.D. 2007). If it appears the trial court improperly sentenced a defendant as a prior and persistent offender, plain-error review is appropriate, because a court may not impose a sentence exceeding the sentence authorized by law. Page, 309 S.W.3d at 372.

A prior and persistent offender is one who has previously pleaded guilty to or been found guilty of two or more felony offenses committed at different times. Section 558.016.2-.3. Here, during the prior and persistent offender hearing, Defendant admitted to having pleaded guilty to (1) felony possession of cocaine in Cause Number CR01002327-00 in the Circuit Court of the City of Norfolk, Virginia on July 24, 2001, and (2) felony possession of cocaine in the Circuit Court of Virginia Beach, Virginia on February 27, 2002. The court confirmed he entered pleas of guilty in two separate felony charges of possession of cocaine and he had two prior convictions before entering its finding that Defendant was a prior and persistent offender. Although the State admitted the records for the two prior convictions at trial, they are not

13

included in the legal file and neither party on appeal can locate them. The record here does not include any information about Defendant's two prior felony convictions, and the similarities between the charged crimes, the plea dates, and the plea locations do not allow this Court to clearly infer beyond a reasonable doubt that the felonies were committed at different times. Cf. State v. Bourrage, 175 S.W.3d 698, 707 (Mo. App. E.D. 2005) (noting appellate court may sometimes infer by reason of dates, geography, and nature of offenses that crimes were committed at different times). While Defendant admitted he entered pleas to two separate felony charges, he did not admit on the record that the underlying crimes were committed at different times. Cf. Smith v. State, 353 S.W.3d 93, 94, 97 (Mo. App. E.D. 2011) (admission of two prior convictions of different crimes under oath sufficiently established all facts necessary for plea court to find defendant to be persistent felony offender).

Nevertheless, even if the trial court's prior-and-persistent-offender finding was erroneous, no manifest injustice occurred. Defendant here was convicted of the class C felony of second-degree assault and the class C felony of abuse of a child, which carry a sentence of up to seven years in prison. Section 558.011.1(3). The seven-year sentence imposed here was within that range of punishment. Because Defendant did not receive an enhanced sentence under the prior and persistent statute, he cannot establish that the alleged error had any effect on his sentence. See Page, 309 S.W.3d at 372.

Point denied.

14

## Conclusion

The judgment and sentence of the trial court is affirmed.

Gary M. Gaertner, Jr., Judge

Philip M. Hess, P.J., concurs.
Angela T. Quigless, J., concurs.

15