

# In the Missouri Court of Appeals
# Eastern District

**DIVISION TWO**

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED103554 |
| | ) | |
| Respondent, | ) | |
| | ) | Appeal from the Circuit Court |
| | ) | of Cape Girardeau County |
| vs. | ) | Cause No. 13CG-CR00918-01 |
| | ) | |
| GEORGE EDWIN JOSEPH, | ) | Honorable Benjamin Frederick Lewis |
| | ) | |
| Appellant. | ) | Filed: December 6, 2016 |

## I.     Introduction

George Edwin Joseph ("Defendant") appeals his conviction for two counts of first-degree murder in violation of § 565.020 RSMo 2000 and one count of armed criminal action in violation of § 571.015 RSMo 2000.[1] Defendant argues in his first two points that the trial court erred in admitting his incriminating statements because they were the product of custodial interrogation, involuntary, and in violation of Defendant's right against self-incrimination and right to counsel. Defendant argues in his third point that the trial court abused its discretion in overruling his objection to the State's question to a witness about the validity of Ferrotrace testing and he was prejudiced by the State's unsworn testimony. In his fourth point on appeal, Defendant claims he was prejudiced by the State's comments regarding deliberation during

---

[1] All references are to Mo. Rev. Stat. 2000 unless otherwise specified.

1

closing arguments. In his fifth point, Defendant alleges that he was prejudiced and the trial court erred in refusing to instruct the jury on how to evaluate the evidence of Defendant's investment practices. Finally, in points six and seven, Defendant argues that the trial court erred in refusing to instruct the jury on involuntary manslaughter. We affirm the decision of the trial court.

## II.     Factual and Procedural Background

On the morning of May 30, 2013, at Defendant's home in Cape Girardeau, the bodies of Defendant's wife (Mary Joseph) and son (Matthew Joseph) were found in their beds, wrapped in sheets and covered by pillows, with rosaries placed on top of them. They were both shot in the back of their heads three times with bullets fired from a .22 caliber gun. There was no sign of forced entry into the home and the forensic pathologist who performed the autopsies on the victims opined they died while sleeping. Defendant was found sitting by the pool, covered in blood. He later made statements to medical personnel and police officers that he had shot himself in the pool. He sustained serious injuries to his head and was taken immediately to a local hospital. He was then flown to Barnes Jewish hospital ("the hospital"), where he underwent two surgeries and was placed on a ventilator in the Intensive Care Unit. Police recovered a .22 caliber gun from the pool alongside a spent casing.[2]

On June 4, 2013, the hospital called Sergeant Don Perry ("Officer Perry")[3] to inform him that Defendant had been removed from the ventilator and was able to speak. Officer Perry and Sergeant Jeff Bonham ("Officer Bonham") drove to St. Louis to interview Defendant about what occurred at his home on May 30 and collect DNA evidence. In order to visit Defendant, all persons, including the police, had to go through the hospital's security. Pursuant to the hospital's

---

[2] Police also recovered a second gun from the living room of Defendant's home. The State presented evidence at trial showing Defendant had borrowed both of these guns shortly before May 30.

[3] Because the officers involved in this case have differing titles at different points in time, we will refer to them as "Officer" for clarity and ease of reading. No disrespect is intended.

2

policy for crime victims, Defendant was located on a secure floor with limited outside access. The officers donned protective suits and recorded their interview with a video camera. Before the officers began questioning Defendant, he asked to speak with his attorney. Defendant repeatedly told the officers he did not want to answer any questions without his attorney, and at one point asked them to stop questioning him without his attorney present. However, the officers continued to question Defendant, and after about twenty minutes he stated: "There's nobody else involved. I'm not going to shoot anybody." The officers asked for more details about what happened but Defendant did not answer any more of their questions. He told them at one point he would get out of the hospital soon and he would talk to them with his attorney. Officer Perry stated "I don't know if you didn't want your family to go through the shame of the financial issues" to which Defendant replied, "That's what it was." The officers left Defendant after questioning him for two hours.

As the officers left, they encountered Defendant's family members and helped them gain access to Defendant's hospital room. The police informed the hospital's security who the family members were and that they needed to obtain Defendant's signature in order to proceed with burying Defendant's wife and son. Defendant's brother, Gerard Joseph, and brother-in-law, David Snell, visited him along with other family members. Mr. Snell testified he was close to Defendant, and he was one of the first people to arrive at Defendant's home on the morning of May 30 and discover the bodies of his nephew and sister-in-law. Mr. Snell testified he visited Defendant in the hospital shortly after the police left, and Defendant told him, "He had to put them in a better place" and he "was so sorry."

On June 7, 2013, Defendant was arrested when he was discharged from the hospital. He was charged with two counts of murder in the first-degree in violation of § 565.020. Defendant

was also charged with one count of armed criminal action under § 571.015 for using a gun to kill Mary Joseph. Prior to trial, Defendant filed a motion to suppress his statements made to the police and recorded at the hospital. Defense counsel argued that Defendant was subjected to a custodial interrogation without being read his *Miranda* rights in violation of the Fifth Amendment, and that the statements were involuntary under the Fourteenth Amendment. The trial court found Defendant's constitutional rights were not violated and denied the motion.

On May 14, 2015, in a second pre-trial motion, Defendant again argued the statements he made to the police at the hospital should be suppressed. His counsel presented evidence that Defendant was on amnesiac medication and his brother testified Defendant was very groggy, delirious, and delusional on the day the officers questioned him. The State opposed the motion, claiming the medical records and officers' testimony indicated Defendant was conscious, coherent, and not in any pain while the officers questioned him. The court again denied Defendant's motion.

Trial was held on July 20-23, 2015, and the jury returned a verdict of guilty on the two counts of first-degree murder (Counts I and II) and the count of armed criminal action (Count III). Defendant filed motions for judgment of acquittal at the close of the State's evidence and at the close of all the evidence, which the trial judge denied. Defendant filed a motion for new trial on August 12, 2015. On September 18, 2015, the trial court denied this motion and sentenced Defendant to life without parole on Counts I and II and to 50 years on Count III, with all three sentences to run consecutively. Defendant filed his notice of appeal on September 24, 2015.

### III.    Discussion

In Defendant's first and second points on appeal, he argues the trial court clearly erred in admitting his statements made at the hospital because (a) they were the product of an un-

4

Mirandized custodial interrogation and violated Defendant's Fifth Amendment rights; (b) they were involuntary under the Fourteenth Amendment; and (c) admitting them violated Defendant's Fifth Amendment privilege against self-incrimination.

### a. The trial court did not clearly err in admitting Defendant's statements because they were not the product of custodial interrogation.

In his first point on appeal, Defendant argues the trial court clearly erred in admitting his statements made at the hospital because the police did not Mirandize him prior to subjecting him to a custodial interrogation, thus admitting the statements violated Defendant's Fifth Amendment rights under *Miranda v. Arizona*. 384 U.S. 436, 444 (1966).

An appellate court will not reverse a trial court's ruling on a motion to suppress unless the court's decision was clearly erroneous. *State v. Ivy*, 455 S.W.3d 13, 17 (Mo. App. E.D. 2014). On appeal, this Court is limited to determining whether there was sufficient evidence to support the trial court's ruling. *State v. Brown*, 18 S.W.3d 482, 484 (Mo. App. E.D. 2000). We consider the facts and evidence in the light most favorable to the trial court's ruling and disregard any contrary evidence and adverse inferences. *Ivy,* 455 S.W.3d at 18. When the issue concerns an individual's constitutional rights, this Court defers to the trial court's findings of fact, but we review the conclusions of law *de novo*. *State v. Williams*, 163 S.W.3d 522, 525 (Mo. App. E.D. 2005). Whether a suspect was in custody at the time of questioning is an issue of law we review *de novo*. *State v. Little*, 473 S.W.3d 662, 667 (Mo. App. E.D. 2015).

A criminal suspect is entitled to *Miranda* warnings to protect his Fifth Amendment right against self-incrimination, but only when the suspect is subjected to a "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *State v. Werner*, 9 S.W.3d 590, 595 (Mo. banc

5

2000).[4] "A custodial interrogation occurs only when the suspect is formally arrested or is subject to arrest-like restraints." *State v. Glass*, 136 S.W.3d 496, 508-09 (Mo. banc 2004). "In Missouri, custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 511. "In the absence of arrest or restraint of freedom of movement, questioning that takes place in a coercive environment does not require *Miranda* warnings." *Id.* Because we find the officers "interrogated" Defendant in his hospital room, this point hinges on whether he was in custody at the time of the interview.

"Custody is determined by an examination of the totality of the circumstances." *Werner*, 9 S.W.3d at 595. The Supreme Court of Missouri noted, "an accused's freedom to leave the scene and the purpose, place, and length of an interrogation are factors to be considered in making a determination of custody." *Id.* (citing *United States v. Griffin*, 922 F.2d 1343, 1348 (8th Cir. 1990)). "In examining the totality of the circumstances, courts may also consider an individual's personal background, experience, familiarity with police questioning, maturity, education, and intelligence." *Id.* at 595-596. The Court went on to enumerate six additional factors[5] for courts to take into consideration when determining custody:

(1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;
(2) Whether the suspect possessed unrestrained freedom of movement during questioning;

---

[4] Our analysis focuses on whether Defendant was in custody when interviewed by the police, but we feel it is important to note that the officers clearly interrogated him. According to the United States Supreme Court "interrogation" includes any "words or actions on the part of the police…that the police should know are reasonably likely elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980). Officers Perry and Bonham asked Defendant numerous questions throughout their interview that were reasonably likely to elicit an incriminating statement from the Defendant. Thus, the two-hour "interview" was an interrogation. *See id*.
[5] However, this list is not exhaustive. *Werner*, 9 S.W.3d at 595.

(3) Whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to answer questions;

(4) Whether strong arm tactics or deceptive stratagems were employed during questioning;

(5) Whether the atmosphere was police dominated;

(6) Whether the suspect was placed under arrest at the termination of questioning.

*Id*. (citing *Griffin*, 922 F.2d at 1349).

This Court has held the ultimate inquiry in determining custody is whether the restraint on the suspect's movement rose to the degree associated with a formal arrest. *State v. Hill*, 247 S.W.3d 34, 47 (Mo. App. E.D. 2008) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). Courts must make two discrete inquiries in order to make this determination: "[F]irst what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Hill*, 247 S.W.3d at 47. (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

On appeal, the State argues Defendant was not in custody at the hospital when the police questioned him on June 4, 2013. In support, it highlights that Defendant was not physically restrained by the police, was informed he could end the interview and had the right to speak to his attorney, was conscious and alert throughout the interview, and was not arrested at the conclusion of the interview.[6] The officers asked Defendant several times how he felt and told him he had the right not to speak with them. At the beginning of the interrogation, Defendant affirmatively expressed his desire to not talk to the police. Defendant then gave the officers permission to take pictures of his head and take his fingerprints and DNA, and the officers questioned him about the events on May 30. Defendant did not ask the officers to leave after they

---

[6] The officers stated at the second hearing on the motion to suppress that Defendant was not arrested on the day of the interview for medical reasons.

7

began questioning him. Instead, Defendant stated that he did not want to answer any questions without his attorney present and told the officers to stop asking him questions.

In *State v. Schnick*, the defendant claimed that police questioning him in the hospital constituted custodial interrogation because his medical condition confined him to his hospital room, effectively depriving him of his freedom. 819 S.W.2d 330, 334-35 (Mo. banc 1991). In *Schnick*, a deputy sheriff and his wife visited the defendant in the hospital on the day after the defendant's wife, her sister and brother-in-law, and their four children (defendant's nephews) had been found shot to death. *Id*. at 333-34. The defendant was found with minor wounds to his abdomen and leg. *Id*. at 333. The officer told the defendant "I'm your friend, but I'm here as a deputy sheriff." *Id*. at 334. The defendant did not confess to committing the crimes but made some incriminating statements that were introduced at trial. *Id*. The defendant claimed on appeal he was deprived of his freedom because he was restricted to his hospital room and was thus in custody and required to be Mirandized. *Id*. The Supreme Court of Missouri held *Miranda* warnings were not required "[b]ecause the defendant was free to terminate the interview and require [the officer] to leave, [and therefore] the coercive aspects of a custodial interrogation were not present." *Id*.; *see also United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007) (holding when a suspect is hospitalized and cannot leave, the inquiry for custody is whether a reasonable person would have felt like he was at liberty to terminate the interrogation); *see also State v. Seibert*, 103 S.W.3d 295, 301 (Mo. App. S.D. 2003) (holding because "defendant was free to terminate the interview and require the officers to leave" he was not in custody).

Defendant argues his case is distinguishable from *Schnick* and *New* because Defendant continuously invoked his right to counsel.[7] However, the Fifth Amendment right to counsel is

---

[7] Defendant also argues his case is distinguishable because he was questioned by two officers instead of one but we find this argument unpersuasive.

not triggered during non-custodial interrogations. *Seibert*, 103 S.W.3d at 300 (citing *State v. Brown*, 18 S.W.3d 482, 483 (Mo. App. E.D. 2000)) (holding the rule set forth in *Miranda* that questioning must cease if an accused requests counsel does not apply to non-custodial requests for counsel). Therefore, the officers did not violate Defendant's Fifth Amendment right to counsel by remaining and asking questions.

Defendant asks this Court to construe his requests for counsel as implying Defendant wanted to end the interview. However, the issue on appeal is whether Defendant felt free to end the interview. *Seibert*, 103 S.W.3d at 301 (citing *Schnick*, 819 S.W.2d at 334). The record demonstrates Defendant never told the officers to leave after giving them permission to stay to collect evidence, even though the officers informed him they would in fact leave if that is what he wanted. The officers asked Defendant if he felt pressured by them and whether he was in any pain, to which the Defendant responded "no." They asked him how he felt multiple times throughout the interview and Defendant stated he felt fine. Defendant also told the nurse he felt fine when she checked on him halfway through the interview.

We are mindful of the factors that Defendant brings to our attention, including the fact that Defendant stated at the beginning of the interview that he did not want to answer any questions without his attorney present and he repeated this throughout the first half of the interview. Additionally, Officer Perry was called by the hospital after Defendant was able to speak for the first time since his hospitalization. Defendant's family was not present when the officers interviewed him.[8] Defendant told the officers at one point that he could not think clearly,

---

[8] Officer Perry testified that he contacted hospital security shortly after Defendant arrived and gave them an understanding of what the situation at the Joseph home was but he never told the hospital Defendant needed to be restrained. Officer Perry additionally testified that the hospital placed Defendant on "silent status" which meant that the hospital would not confirm to anyone whether Defendant was at the hospital. Officer Perry stated this was part of the hospital's security measures and policies, and they did not do this at his request. He and Officer Bonham had to go through the hospital's security to see Defendant.

and Defendant's brother testified Defendant was not coherent. The officers kept Defendant lying down, even though he asked them to raise him up early in the interview. Finally, the trial court noted Defendant was not likely to leave the room given his medical state.

However, in circumstances similar to those here, the Southern District found a defendant was not in custody when police questioned him at the hospital and therefore defendant's Fifth Amendment rights were not violated. *State v. Seibert*, 103 S.W.3d at 301. In *Seibert*, Defendant was questioned by police at the hospital while receiving treatment for severe burns sustained from setting his mother's trailer on fire, resulting in the death of victim. *Id*. at 298. The defendant was Mirandized by the interviewing officer, even though he was not placed under arrest, and he immediately invoked his right to speak with an attorney. *Id*. at 300. However, the court found that "[t]he *Miranda* right to counsel is not triggered…during non-custodial interrogations." *Id*. On appeal, the defendant argued several factors supported a finding he was in custody including: "he was physically unable to leave the burn unit of the hospital where he was interrogated; he was only at the hospital for the time necessary to treat his injuries; it was clear when Officer Hanrahan interrogated him that he would be charged…; he was not free to leave on his own at the time of the interview; and he was transported to the county jail upon his release from the hospital." *Id*. at 301. The court held the fact that defendant was in the hospital did not mean, by itself, he was in a custodial setting. *Id*. ("As in *Schnick*, the record here does not indicate Defendant was prevented from halting the interview at any time and directing [Officer] Hanrahan to leave the hospital room"). The court also noted that the fact a person is a suspect at the time of the interview does not make it a custodial interrogation under *Miranda*. *Id*. Finally, the court stated "[d]efendant was not arrested until sometime after the…interview when he was released from the hospital, and there is nothing in the record indicating that he could not have

10

terminated the…interview at any time." *Id*. The Southern District concluded the record did not support a finding that the defendant was subjected to a custodial interrogation and therefore "his request for counsel did not trigger a *Miranda* right to counsel during that interview." *Id*. (citing *State v. Brown*, 18 S.W.3d 482, 483 (Mo. App. E.D. 2000)). Similarly, in the present case, the fact that Defendant's interview took place in a hospital does not automatically make it custodial. The proper question before this Court is whether Defendant felt free to terminate the interview. There are additional factors here that support the trial court's ruling which were not present in *Seibert*: (1) in *Seibert*, the defendant's hospital interview took place immediately after he sustained his injuries; here Defendant's interview took place six days later, after the hospital determined he was medically stable, and (2) here the officers told Defendant that he had the right to end the interview and ask them to leave; the defendant in *Seibert* was not told this information. These factors support a finding that Defendant was not in custody at the time of his interview.

After reviewing the record as a whole, it is apparent that Defendant was not deprived of his freedom of action in any significant way or restrained to an equivalent degree of a formal arrest. When the police first entered Defendant's hospital room they were accompanied by two nurses who asked Defendant if it was alright if the police asked him questions and assured Defendant they would be right outside the room if he needed them. Defendant selectively answered their questions throughout the interview, telling them he shot himself, he was the only person involved in the deaths of his wife and son, and that he did it in order to spare them from the "financial shame". Defendant's answers were consistent, rational, and coherent throughout the interview. Defendant was not crying or visibly upset during the interview. There were breaks in questioning and the nurses checked on Defendant after approximately one hour. The nurses and officers asked Defendant how he felt to which he responded he felt fine. After a twenty

11

minute break in questioning, the officers resumed collecting evidence by photographing

Defendant's injuries. They did not persistently ask him questions about what happened. Often

times, the officers spoke conversationally with Defendant, asking him questions unrelated to the

deaths of his wife and son, and they left after another 30 minutes.

These circumstances did not amount to a coercive environment that restrained

Defendant's freedom to the same degree as a formal arrest. Based on the foregoing, we find

Defendant was not in custody at the time of his hospital interview. Accordingly, Defendant was

not entitled to invoke his Miranda rights, and his Fifth Amendment rights were not abridged by

admitting his incriminating statements into evidence.

### b. The trial court did not clearly err in admitting Defendant's statements because they were voluntary.

We now address Defendant's argument that his statements at the hospital were

involuntary and the trial court erred in admitting them in violation of the Fourteenth

Amendment. The Due Process Clause of the Fourteenth Amendment bars involuntarily obtained

confessions from being admitted at trial. *State v. Faruqi*, 344 S.W.3d 193, 203 (Mo. banc 2011)

(citing *Ashcraft v. Tennessee*, 322 U.S. 143, 155 (1944)). A confession is involuntary only when

"the totality of the circumstances created a physical or psychological coercion sufficient to

deprive the defendant of a free choice to admit, deny, or refuse to answer the examiner's

questions." *Faruqi*, 344 S.W.3d at 203. Coercive police activity is necessary to find any

statement involuntary and inadmissible. *Colorado v. Connelly,* 479 U.S. 157, 167 (1986). "In

order for a defendant's statements to be considered involuntary due to coercive tactics by the

police, it must be demonstrated that the defendant's will was overborne as a result of said

tactics." *State v. Harris*, 477 S.W.3d 131, 140 (Mo. App. E.D. 2015).

Defendant relies on *Mincey v. Arizona*, where the United States Supreme Court held that the defendant's incriminating statements made to police at the hospital were inadmissible. 437 U.S. 385, 402 (1978). In *Mincey*, a detective questioned defendant in the emergency room, hours after his involvement in a shoot-out in which defendant was severely injured. *Id*. at 397. The defendant was unable to speak and communicated by writing on paper. *Id*. The detective Mirandized him prior to asking questions, and although defendant wrote that he wanted an attorney, the detective continued to interrogate him for approximately four hours. *Id*. The defendant communicated that he was in unbearable pain, lost consciousness multiple times during the interrogation, and gave nonsensical answers. *Id*. at 398-401. The United States Supreme Court found his statements were involuntary because they were the product of continuous questioning of "a seriously and painfully wounded man on the edge of consciousness," whose will was overborne by the officer's questions and whose responses were not "the product of [the defendant's] free and rational choice." *Id*. at 401-02.

The circumstances of this case are distinguishable from those in *Mincey*. Defendant was able to speak to the officers clearly and did not have to communicate by writing on paper. The officers and nursing staff asked Defendant how he felt and whether he was in any pain to which Defendant consistently responded "no" or "I'm fine." Defendant never lost consciousness or gave illogical answers to the officers' questions. Unlike the defendant in *Mincey*, who was questioned immediately after arriving at the emergency room Defendant was interviewed after six days of recuperating and the police were contacted once the hospital determined Defendant was medically stable and able to speak to them. Moreover, in *Mincey*, the police subjected the defendant to "virtually continuous questioning" for four hours; in the present case, Defendant told the officers he was the only one involved in the deaths of his wife and son just twenty

13

minutes into the two-hour interview, and he was only questioned intermittently. Although later in the interview, he told the officers he shot his wife and son to spare them from the shame of his debts, Defendant elected not to answer the majority of the officers' questions about what happened at his home on May 30th. The fact that Defendant chose to answer certain questions and not to answer others shows his will was not "overborne" and he had the ability to make rational choices.

The video of the interview shows Defendant was conscious, coherent, and medically stable. At the second suppression hearing, the officers testified they did not believe Defendant was heavily medicated because his speech was not slurred, he never lost consciousness during the interview, and he never changed topic midsentence. Officer Perry testified Defendant was "very alert, very attentive to our questions, us being there, what was going on." He stated Defendant's answers made sense and Defendant said he was not in pain. Defendant argues his will was overborne because he had the hiccups throughout the two-hour interview due to internal bleeding. He told police at one point he "could not think straight" and his brother testified Defendant was "groggy, delirious and delusional" when he spoke to him soon after the interview. Despite this, Defendant was able to provide the officers with correct answers when they asked him his birthdate, social security number, his home address and what year he graduated high school. Defendant demonstrated that his cognitive abilities were not greatly affected by his condition. For example, he corrected the officers toward the end of the interview on the current month. Defendant appeared to understand all of the officers' questions, and he chose not to answer the majority of them. Based on the foregoing, the trial court did not clearly err in finding the statements were voluntary and admissible.

> **c. The trial court did not violate Defendant's Fifth Amendment rights by admitting the recording of the Defendant's hospital statements into evidence.**

Defendant alternatively argues that admitting his responses to the officers' questions violated his Fifth Amendment privilege against self-incrimination. U.S. Const. amend. V; Mo. Const. Art. I, Section 19. The Fifth Amendment provides that "no person… shall be compelled in any criminal case to be a witness against himself[.]" *Id*. The Missouri Constitution provides the same level of protection against self-incrimination as the federal Constitution. *State v. Tally*, 153 S.W.3d 888, 892 (Mo. App. S.D. 2005). Indeed, *Miranda* is based on this fundamental notion that:

> [T]here can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of *in-custody interrogation* of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

*Miranda v. Arizona*, 384 U.S. at 467 (emphasis added).

However, in a pre-custodial setting, a defendant's invocation of his Fifth Amendment rights does not mandate that police must cease questioning. *State v. Brown*, 18 S.W.3d 482, 484-485 (Mo. App. E.D. 2000) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 182 n. 3 (1991)). This is different from custodial interrogation where "an accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation must cease." *Fare v. Michael C.*, 442 U.S. 707, 719 (1979). Defendant cites *United States v. Okatan* to support his argument that admission of the video recording violated his Fifth Amendment right against self-incrimination. 728 F.3d 111 (2d Cir. N.Y. 2013). In *Okatan*, the government used defendant's pre-arrest request for an attorney and refusal to answer questions without one as substantive evidence of guilt. *Id*. at 116. The Second Circuit held an individual's "invocation of the privilege

15

against self-incrimination and *his subsequent silence* cannot be used by the government in its case in chief as substantive evidence of guilt." *Id*. at 120. (emphasis added).

The present case is distinguishable because Defendant did not invoke his privilege and then remain silent. Instead, he made affirmative admissions of his guilt. The Fifth Amendment does not prevent the government from using these affirmative statements against Defendant when they were made outside the context of a custodial interrogation. *See McNeil v. Wisconsin*, 501 U.S. at 182 n. 3 ("We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation'"). We do not find that admitting the incriminating statements into evidence violated the Defendant's Fifth Amendment privilege against self-incrimination. Defendant's first and second points on appeal are therefore denied.

> **d. The trial court did not abuse its discretion in overruling defense counsel's objection to the prosecutor's question to Officer Wehrle about the acceptance of Ferrotrace testing and Defendant was not prejudiced.**

In his third point on appeal, Defendant argues the trial court abused its discretion in overruling defense counsel's objection to the prosecutor's question to Officer Kevin Wehrle ("Officer Wehrle") about the acceptance and accuracy of Ferrotrace testing in the scientific community. "Trial courts have great latitude in allowing and forbidding leading questions." *State v. Miller*, 208 S.W.3d 284, 289 (Mo. App. W.D. 2006). An appellate court will only reverse such a decision if it was an abuse of discretion that resulted in prejudice to the defendant. *Id*. "An abuse of discretion will be found only where the ruling in question clearly offends the logic of the circumstances or appears arbitrary and unreasonable." *Id*. at 287.

During direct examination of Officer Wehrle the State asked:

Prosecutor:   One of the other tests you did at the hospital on [Defendant's] hands was something called a [Ferrotrace] test, is that correct?
A:   Yes.
Prosecutor:   And what's that, sir?

16

| | |
|---|---|
| A: | [Ferrotrace] is a presumptive field test to try to find the presence of iron. |
| Prosecutor: | And is that done typically on people who you thought maybe have handled a gun? |
| A: | Yes. |
| Prosecutor: | And what were the [Ferrotrace] results for [Defendant] that you did that day? |
| A: | To my observations, I couldn't locate anything. I didn't observe anything that showed there was any iron deposits on his hands so – |
| Prosecutor: | So you did the test and it was negative? |
| A: | For me, yes. |

On redirect examination, the State questioned Officer Wehrle about Ferrotrace testing:

| | |
|---|---|
| Prosecutor: | Now [defense counsel] asked you about using [Ferrotrace]? |
| A: | Yes. |
| Prosecutor: | Sprayed that on [Defendant's] hands at the hospital, right? |
| A: | Yes. |
| Prosecutor: | And you know that [Ferrotrace] isn't accepted in the scientific community as being completely accurate, right? |
| A: | Okay. |
| Prosecutor: | You don't know that, do you? |
| A: | I don't know that. |
| Prosecutor: | It's a spray and you spray on people's hands? |
| Def. Counsel: | Your Honor, I'm going to object. He says he doesn't know and she's testifying now. |
| The court: | Overruled. |
| Prosecutor: | He doesn't know about the scientific community. |
| The court: | He says he didn't know one way or the other so the objection is overruled. Ask your next question. |

Defendant argues on appeal that this was an attempt by the prosecutor to provide her own testimony instead of eliciting the opinion of the witness. Defendant alleges this statement was "very prejudicial." However, the testimony submitted to the jury was that Officer Wehrle did not know whether Ferrotrace testing was accepted in the scientific community as accurate or not. Alternatively, the jury could have found Officer Wehrle's response meant he did not agree with the prosecutor's statement. Regardless, the jury was instructed that they "must not assume as true any fact solely because it is included in or suggested by a question asked a witness. A question is

17

not evidence, and may be considered only as it supplies meaning to the answer." Instruction No. 2. MAI-CR3d 302.02.

"It is well-established the jurors are presumed to follow the instructions provided." *State v. Dominguez-Rodriguez*, 471 S.W.3d 337, 344 (Mo. App. E.D. 2015). Because the jury was instructed not to consider any of the prosecutor's questions as evidence unless they supplied meaning to a witness's answer, and Defendant failed to provide any evidence to rebut the presumption, the trial court did not abuse its discretion in overruling Defendant's objection. Defendant's third point is denied.

### e. The Defendant was not prejudiced by the prosecutor's statements regarding deliberation during closing arguments.

Defendant argues in his fourth point on appeal, that he was prejudiced by the State's comments during closing argument about the meaning of deliberation. A trial court "has broad discretion in controlling closing argument and counsel is afforded wide latitude during summations." *State v. Thompson*, 390 S.W.3d 171, 174 (Mo. App. E.D. 2012). We review rulings made during closing argument for abuse of discretion. *State v. Smith*, 422 S.W.3d 411, 415 (Mo. App. W.D. 2013). "Unless that discretion has been clearly abused to the prejudice of the accused, the trial court's ruling should not be disturbed on appeal." *Id*. In order to establish prejudice, the burden is on the defendant to show there is a reasonable probability the verdict would have been different absent the trial court's abuse. *Id*. at 18.

During the State's closing argument, the prosecutor argued as follows:

Something else I don't want to spend a lot of time on is murder first versus murder second. The only difference between those two degrees is deliberation. The Judge read you that instruction and in it deliberation means cool reflection upon the matter for any length of time no matter how brief. Mary and Matthew were murdered in their sleep. They were shot three times in the head apiece. That's a pretty deliberate thing. This isn't a question of whether Mr. Joseph is

guilty of murder in the first or murder in the second degree because clearly shooting someone three times in the head is deliberate. There's deliberation.

Defense counsel: Your Honor, I'm going to object at that point in time. That does not meet the definition of deliberation just pulling the -- that's incorrect.

The court: This is argument. The objection is overruled.

Prosecutor: When you shoot somebody three times in the head as they lay sleeping, that's pretty deliberate so this isn't a question of murder first versus murder second.

In Defendant's closing argument, defense counsel argued:

So let's talk a little bit about what [the prosecutor] just said. The instructions will tell you[,] you must find that [Defendant] did this with deliberation. It's a mental state, not that he did anything deliberately. I am deliberately walking. You can deliberately talk. You can deliberately do many[,] many things, but that's not deliberation. Deliberation, the instructions will tell you, is a cool reflection upon the matter for a period of time no matter how brief.

In rebuttal, the prosecutor argued:

I'm going to go back to deliberation. The Judge has read you the instructions. You can read it for yourself. I'm not going to try to get some tortured definition out of it. You can read it yourself. Your common sense will tell you what it means. Just read the instruction.

On appeal, the State argues the prosecutor did not misstate the law and made a permissible inference in her closing argument because deliberate conduct can be indicative of deliberation. *See State v. Baker*, 422 S.W.3d 508, 515 (Mo. App. E.D. 2014) (holding the State has a right to argue reasonable inferences from the evidence and conclusions fairly drawn from the evidence). The instructions submitted to the jury on first-degree murder stated if they found the Defendant purposely caused the deaths of the victims "*after deliberation, which means cool reflection upon the matter for any length of time no matter how brief*" then they must find the defendant guilty. (emphasis added). "It is well-established the jurors are presumed to follow the instructions provided." *Dominguez-Rodriguez*, 471 S.W.3d at 344. Because the jury was properly instructed and the prosecutor told the jury they should read and refer to the instructions for the

definition of deliberation we do not find Defendant suffered prejudice from the trial court's ruling on this issue.

Additionally, in the present case, there was an extensive body of evidence that was both relevant and probative of Defendant's guilt. The evidence favorable to the State included the testimony of the criminal investigators and emergency responders to Defendant's house that there was no sign of forced entry or robbery. Both victims were shot with bullets from the same gun, and the gun used on the victims was the same caliber as the gun found in the pool where Defendant stated he shot himself. Defendant had previously owned this gun and borrowed it from a client shortly before May 30. Its case and holster were found in the top drawer of a dresser in the spare bedroom of Defendant's home. Prior to borrowing this gun, Defendant also borrowed another gun from his brother-in-law, which was found on the couch next to Defendant's normal seat. Officer Perry testified that during Defendant's interview at the hospital, a nurse came in to perform a "neuro check" on Defendant. The nurse asked Defendant if he knew where he was and why he was there and he stated he was at Barnes-Jewish because he shot himself. Finally, there are Defendant's incriminating statements to his brother-in-law that "he had to put them in a better place" and to police that "there was no one else involved, I'm not going to shoot anybody." He confessed to Officer Perry that he killed his wife and son to spare them from the shame of his financial failures.

Based on the foregoing there is not a reasonable probability that the prosecutor's statements affected the outcome of the trial. Therefore they did not result in prejudice to the Defendant. Defendant's fourth point is denied.

**f. The trial court's alleged error in refusing to instruct the jury on how to consider the evidence of Defendant's investment practices was not prejudicial to Defendant.**

In Defendant's fifth point on appeal, he alleges the trial court erred in refusing to give the jury his modified MAI proposed instruction on how the jury should consider the evidence of his investment practices. We review a trial court's decision to give a requested jury instruction *de novo* under § 556.046 RSMo Supp. 2001. *State v. Jackson*, 433 S.W.3d 390, 395 (Mo. banc 2014). "It is within the trial court's discretion to decide whether a tendered jury instruction should be submitted. However, a court is presumed to commit prejudicial error if it fails to use an applicable [Missouri Approved Instruction (MAI)]." *State v. Davis*, 318 S.W.3d 618, 630 (Mo. banc 2010). Appellate courts determine whether the error was prejudicial to the defendant. *See* Rule 28.02(f).[9] "Prejudice exists where there is a reasonable probability that the trial court's error affected the outcome at trial." *State v. Plunkett*, 473 S.W.3d 166, 172 (Mo. App. W.D. 2015).

Courts should give MAI-CR3d 310.12 when the defendant "does not testify and if there is evidence that defendant was involved in but <u>not</u> 'convicted, etc.' of a 'related crime[.]'" MAI-CR3d 310.10 Notes on Use Paragraph 4 (emphasis in original). MAI-CR3d 310.12 instructs the jury how to consider evidence of a defendant's related crimes for purposes of identification, motive, intent, absence of mistake or accident, or presence of common scheme or plan. "Error, which in a close case might call for reversal, may be disregarded as harmless when the evidence of guilt is strong." *State v. Banks*, 215 S.W.3d 118, 122 (Mo. banc 2007). The modified instruction submitted by Defendant read: "If you find and believe from the evidence that the defendant was involved in fraudulent investing practices, you may consider that evidence on the issue of motive of the defendant. You may not consider such evidence for any other purpose." MAI-CR3d 310.12 (Modified). The court rejected this instruction and it was not read to the jury.

---

[9] Missouri Supreme Court Rules 2015.

It is undisputed that the Defendant was in financial trouble on May 30, 2013. Testimony at trial demonstrated he had lost over a million dollars of his clients' money and in the month leading up to May 30 had written 52 bad checks to his clients totaling five hundred thousand dollars. The State characterized Defendant's investment practices during a certain time period as a Ponzi scheme. Several witnesses testified that, after 2011, Defendant used incoming funds from new clients to repay older clients. The defense characterized this investment activity as a temporary measure by Defendant, stating he was trying to stay financially afloat after his investments in the futures market continually lost money.

On appeal, Defendant claims he was prejudiced by the court's failure to read his proposed instruction to the jury, because the jury was free to consider the evidence as evidence of his character generally and not just for motive. Nothing in the record indicates that the jury was more inclined to convict Defendant because the State alleged he engaged in fraudulent investment practices. It is just as likely that the jury properly considered this evidence for motive alone, particularly in light of Defendant's statements to Officer Perry that he shot his wife and son to spare them from the financial shame. As laid out in Section III(e) above, there was an overwhelming body of evidence of Defendant's guilt. Therefore, the trial court's refusal to give the jury Defendant's proposed jury instruction was not prejudicial. Defendant's fifth point is denied.

g. **The Defendant was not prejudiced by the trial court's refusal to instruct the jury on involuntary manslaughter when it instructed the jury on both first and second-degree murder and the jury found Defendant guilty of the greater offense.**

Defendant argues in his sixth and seventh points on appeal that the trial court abused its discretion in refusing to instruct the jury on involuntary manslaughter for Counts I and II (first-degree murder of Mary and Matthew Joseph). We review a trial court's decision to give a

22

requested jury instruction *de novo*. *State v. Jackson*, 433 S.W.3d 390, 395 (Mo. banc 2014). "The trial court is obligated to give an instruction on a lesser-included offense when (1) a party timely requests the instruction; (2) there is a basis in the evidence for acquitting the defendant of the charged offense; and (3) there is a basis in the evidence for convicting the defendant of the lesser-included offense for which the instruction is requested." *State v. Meine*, 469 S.W.3d 491, 495 (Mo. App. E.D. 2015) (quoting *Jackson*, 433 S.W.3d at 396). We have held "[t]here is almost always a basis in the evidence for acquitting a defendant of the immediately higher-included offense because the jury has a right to disbelieve all, some, or none of the evidence presented in a particular case." *Meine*, 469 S.W.3d at 495 (citing *Jackson*, 433 S.W.3d at 399).

In *State v. Meine*, we held that the trial court's failure to instruct the jury on second-degree involuntary manslaughter was not prejudicial to the defendant. *Id.* at 496. "The failure to give a different lesser-included offense instruction is neither erroneous nor prejudicial when instructions for the greater offense and *one* lesser-included offense are given and the defendant is found guilty of the greater offense." *Id.* (emphasis in original) (quoting *State v. Johnson*, 284 S.W.3d 561, 575-76 (Mo. banc 2009)) (holding there was no error when the trial court instructed the jury on first-degree murder and second-degree murder, but refused the defendant's requested instruction on two lesser-included offenses when the jury found the defendant guilty of first-degree murder).

In *State v. Glass*, the Supreme Court of Missouri held that when a jury has been given instructions on first and second-degree murder and finds the defendant guilty of the former "no reasonable basis exists to suggest that the jury would have reduced the conviction had they been presented with a different lesser-included offense instruction…there is no error in failing to give

a different lesser offense instruction because the jury has already been given an opportunity to reject the element of deliberation and did not do so." 136 S.W.3d 496, 515 (Mo. banc 2004).

Like *Meine* and *Glass*, in the present case, the court instructed the jury on first and second-degree murder and the jury found Defendant guilty of the greater offense. The jury determined that Defendant acted with deliberation, accordingly, instructing them on involuntary manslaughter would have been inconsequential. Therefore, there was no prejudicial error in the court's failure to give a second lesser-included instruction on involuntary manslaughter. Defendant's sixth and seventh points are denied.

### IV.    Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
Colleen Dolan, Judge

Sherri B. Sullivan, P.J., concur.
Roy L. Richter, J., concur.